# Richard Townes, Jr.

## v.

# Commonwealth of Virginia

Record Nos. 860793 and 860794

November 25, 1987

Present: All the Justices

*Deborah C. Wyatt (Gordon & Wyatt,* on briefs), for appellant.
*Robert Q. Harris, Assistant Attorney General (Mary Sue
Terry, Attorney General,* on brief), for appellee.

CARRICO, C.J., delivered the opinion of the Court.

Indicted for robbery, capital murder in the commission of robbery, and use of a firearm while committing robbery, Richard Townes, Jr., elected to act as his own counsel. In the guilt phase of a bifurcated proceeding conducted pursuant to Code § 19.2-264.3, a jury convicted Townes of all three offenses and fixed his punishment at twenty years' imprisonment on the robbery charge and two years' imprisonment on the weapons charge.

In the sentencing phase, the jury found there was a probability Townes would commit criminal acts of violence that would constitute a continuing threat to society and fixed his punishment on the murder charge at death. After considering the report of a probation officer, the trial court sentenced Townes to the punishment fixed by the jury in its three verdicts.

Townes appealed his non-capital convictions to the Court of Appeals. Pursuant to Code § 17-116.06, we certified those convictions to this Court (Record No. 860794) and consolidated them with Townes' appeal of his murder conviction and the automatic death sentence review mandated by Code § 17-110.1 (Record No. 860793).

After Townes' capital murder conviction reached this Court, we wrote him indicating our belief that he needed the assistance of counsel in the preparation and filing of his brief and in arguing his case before this Court. He responded with a motion in which he asserted his competence and desire to continue representing himself, but, "with grave reservations," he moved for the assistance of counsel and asked that we appoint Deborah C. Wyatt of Charlottesville. We complied with the request, and Ms. Wyatt has represented Townes ably throughout these appellate proceedings.

## FACTS

The victim, Virginia Goebel, was employed as a cashier at the Gulf Majik Market on Indian River Road in the City of Virginia Beach. She worked the night shift, and on April 13, 1985, reported to work at 9:30 p.m. The person she relieved left at 10:00 p.m., and thereafter she was on duty alone. She was observed

working behind the cashier's counter about 1:15 a.m. by a Virginia Beach policeman on routine patrol. Another policeman, William C. Meador, drove through the Majik Market parking lot about 2:00 a.m., and Goebel waved to him from the store.

Dorothy Moore, who patronized the Majik Market two or three times a week, arrived at the store about 2:00 a.m. on her way home from work. Goebel was behind the counter, and Moore chatted with her briefly. Moore thought Goebel was "acting really strange, nervous."

Moore walked to the rear of the store to get a soft drink and was startled by a man standing "in the back corner . . . just watching," with his arms crossed "[l]ike [he had] something in his hand." He gave Moore "this smile," but did not speak. She obtained a bottle or can of Coca Cola and proceeded to the cashier's counter. After paying Goebel for her soft drink, Moore asked Goebel whether she was "sure everything [was] okay." Although "acting scared," Goebel replied she was "fine" and told Moore to leave because she needed "to lock the doors."[1]

Moore left the store and went to her car. As she pulled out of the parking lot, she observed that Goebel was still standing behind the counter but that the man who had startled Moore had moved to the front of the store and was "looking as [she] was leaving."

About 4:45 a.m., Officer Meador returned to the Majik Market. As he entered the parking lot, a motorist pulled up to the gas pumps, tried unsuccessfully "to get gas," and then went into the store. He "came back out" and said to Meador, "[t]here is something inside you ought to see."

Meador went inside and found Goebel's body lying face down behind the counter in a pool of blood. Meador felt for a pulse, but Goebel's body was cold. On the floor next to the body, Meador found an empty .45 caliber shell casing.

An autopsy performed on Goebel's body revealed that her death was caused by a gunshot wound to her head. A .45 caliber bullet had entered the top of her head, travelled through the middle of her brain, and lodged in her spinal canal, "where the neck joins the thorax in that canal." The medical examiner opined that Goebel was on the floor, looking down, with her head "a foot and a

---

[1] The Majik Market remained open twenty-four hours a day, but night employees were authorized to lock the doors and transact business through a window at the front of the store.

half to two feet" from the floor, when she was shot. The medical examiner also said that the murder weapon was resting on the victim's head when the fatal shot was fired. The exact time of death could not be determined.

The last sale recorded on the Majik Market cash register for Goebel's shift occurred at 2:43 a.m. The next previous sale was recorded at 2:16 a.m. for $.52, the price of "canned Cokes," plus tax.

The cash register drawer and the top of a floor safe were open. No paper currency was found in the cash register. An audit of transactions occurring during Goebel's shift established a shortage of $186.13.

On a shelf under the cashier's counter, a detective discovered a number of "drop envelopes" containing paper currency totaling $240. Store policy required that when a number of large bills accumulated in the cash drawer, they should be placed in "drop envelopes" and put in the floor safe. Goebel, however, had difficulty using the safe. She was a heavy woman, weighing 328 pounds, and had to get down on her knees to open the safe. Her body was lying next to the safe, and blood was spattered on the door of an adjoining cabinet.

Dorothy Moore learned of the murder mid-morning of April 14, but she did not contact the police for four weeks. On May 29, a detective showed her photographs of six men. She picked two of the men, including Townes, as suspects and told the officer she "could better [make an identification] in a lineup." On June 5, she attended a live lineup which included Townes and four other men. She made a positive identification of Townes as the man she had seen in the Majik Market on the night of Goebel's murder. Two other employees of the Majik Market identified Townes as a frequent customer of the store.

Townes was also identified as the person who, on April 10, 1985, a few days before the Goebel murder, called at the home of Herman F. Christenbury in response to an advertisement Christenbury had placed in the *Tidewater Trading Post* for the sale of a Star brand .45 caliber automatic handgun for $215. Townes paid Christenbury in cash and received the gun plus an extra clip, an unusual cleaning rod with a small screwdriver on one end, and an old brown holster.

Townes worked as a laborer on a project being developed in Virginia Beach by DeAnne Company. He lived nearby in an

apartment located within a few minutes drive of the Majik Market. On April 15, the Monday after the Goebel murder, Townes arrived late for work. Goebel's brother-in-law worked in the same construction crew as Townes, and the murder was discussed among members of the crew. Townes worked for about an hour and then left, claiming that he had "a rough weekend" and was feeling ill.

George Ponton was another member of the construction crew. On the construction site one day in late April, Ponton observed a gun "in [Townes'] back pants pocket." The next day, Ponton asked to see the weapon, and Townes handed it to him. It bore the word "Star" on its side. Townes let Ponton fire the gun and offered to sell it to him. Ponton agreed and paid Townes $250 for the gun, two clips, a cleaning rod, a box of Federal ammunition, a ski mask, and an old brown holster.

Later, Ponton and Gregory Fair, superintendent for the De-Anne Company, fired the gun into a barrel at the jobsite and also at a firing range, using ammunition Ponton had received as part of his purchase from Townes. Ponton saved the empty casings from the firing at the range and took them home.

Officer Russell Mike of the Virginia Beach Police Department owned one of the homes built by DeAnne Company and knew Fair, Ponton, and Townes. In late April 1985, Mike visited the DeAnne Company office. During his visit, Fair showed Mike the gun Ponton had purchased from Townes.

When Townes learned that Ponton had shown the gun to Fair and that Fair had shown it to Mike, Townes became angry. He told Ponton: "You shouldn't show a gun to a white man."

In early May, Fair found in his office at the construction site "a Jehovah's Witness book . . . and a legal book." With the books was an essay in Townes' handwriting "pertaining to what Jehovah would do to him for murdering somebody." Fair confronted Townes with the material and told him to "get it off [Fair's] desk and . . . off the job."

On May 15, Officer Mike returned to the DeAnne construction site. Since his earlier visit, he had learned that a .45 caliber weapon had been used in the Goebel murder. He contacted Ponton and told him to get in touch with Detective Thomas A. Baum, who was in charge of the Goebel murder investigation, at a telephone number Mike gave Ponton.

Ponton decided to "hand the gun to the police." After work on May 15, he went to a telephone outside a 7-Eleven store and was in the process of placing a call to Detective Baum when Townes drove up and blocked Ponton's car in its parking space. Townes asked Ponton if he still had "the gun" and "demanded [it] back." Ponton attempted to stall, but Townes became "nervous and shaken." When Ponton asked about the money he had paid for the gun, Townes shoved a bag into Ponton's hand and "took the gun away" from Ponton, along with one clip and the holster. Townes then got in his car and sped off, running a red light. The bag Townes gave Ponton contained a .44 caliber revolver.

After Townes left, Ponton called Detective Baum and arranged to meet him at a fixed location. Ponton gave Baum the .44 caliber revolver and also the empty shell casings he had kept after firing the .45 caliber Star automatic at the firing range.[2]

Later in the evening, Townes called Ponton and told him that he, Townes, knew Ponton wanted to turn the Star .45 automatic over to the police. When Ponton asked when he would get his gun back, Townes said: "You will get it back as soon as the heat is off."

Later that same evening, Fair called Townes at the latter's home and discharged him from employment with the DeAnne Company. The next day, Fair saw Townes and demanded the return of some tools. Fair also asked Townes to give him the Star .45. Townes said "he already had gotten rid of it."

Townes was arrested on May 16 and charged with the offenses of which he was later convicted. With his consent, his car was searched by Detective Baum; hidden in the trunk was a plastic case containing a cleaning rod for .45 caliber weapons.

At the Virginia Beach jail, Townes was placed in a cell block with Dennis Brezler, an acquaintance of some twelve years. They discussed the charges pending against Townes. After two or three conversations in which Townes told differing stories implicating other people, Brezler asked Townes if he "did . . . it." Townes replied, "yes, but . . . the Commonwealth's Attorney's case is so weak there is no way they can prove it." The case was weak, Townes told Brezler, because "[t]hey didn't have any gun." Townes explained that he had "swapped" the gun with a co-

---

[2] The next day, Ponton turned over to the police the extra .45 caliber clip, the ski mask, and the cleaning rod he had received from Townes.

worker in exchange for another weapon. Townes also said the case was weak because he could not have manhandled "a woman that was supposed to have been so big" and because he frequented the Majik Market and his presence there on the night of the murder would not affect the case "very much at all."

Townes told Brezler he was restless and could not sleep on the night of the murder, so he got out of bed about 1:30 a.m. and went to the Majik Market, where the "occurrence," meaning "the killing," took place "around 2:15 or 2:30." When he returned home, Townes told Brezler, his wife "was sleeping."

When Brezler was due to be released from jail, Townes asked him to look through the *Trading Post* in an effort to acquire a Star .45 and "plant it somewhere" near the scene of the crime in an effort to "more or less screw up the Commonwealth's Attorney's case." For this service, Townes promised Brezler he would be reimbursed for the gun he purchased and paid $200 for "helping . . . out." After he was released from jail, Brezler did not comply with Townes' request but went to the authorities with the information about his conversations with Townes.

John G. Ward, a firearms expert employed by the State at the crime laboratory in Norfolk, compared the empty shell casing found next to Goebel's body with the empty casings Ponton had saved from the firing range and turned over to the police. Ward determined that the casings were all from .45 caliber cartridges manufactured by Federal Cartridge Company and that all had been fired in the same weapon.

Ward also examined the bullet which was removed from Goebel's body with one removed from the barrel into which Fair and Ponton had fired at the DeAnne jobsite. Both bullets were .45 caliber and shared certain characteristics, but Ward could not say conclusively that they were fired from the same gun. In addition, Ward examined the cleaning rod with the screwdriver on one end which Ponton had turned over to the police. Ward said the "screwdriver tip" on the rod was "rather unique."

## PRETRIAL MATTERS

### Waiver of Counsel

Initially, the Office of the Public Defender was assigned to represent Townes. Later, the public defender withdrew from the case and the trial court appointed two other attorneys to represent

Townes. Then, on November 21, 1985, Townes moved to dismiss his court-appointed counsel and to be permitted to represent himself. The court heard this motion on December 4, 1985, and granted it.

In the hearing on the motion, Townes stated that his desire to represent himself was not "necessarily" because of anything court-appointed counsel had "failed to do" but, rather, because "this [was] more or less a right that [he was] entitled to." Townes, who was 35 years of age at time of trial, said that he had completed two years of study at Steed College, a "business college" in Staunton.

Townes also stated that while incarcerated on a previous conviction, he was "a law clerk" and had "studied through correspondence . . . and secured a two-year certificate in paralegal." He further said that his I.Q. was 119 and that he had previously represented himself in a habeas corpus proceeding. Townes told the court that he was familiar with the rules of evidence and procedure and that he understood the necessity of contemporaneous objections.

Townes says on appeal that the trial court made "insufficient inquiry into [his] background and knowledge of the full ramifications of his decision for a valid waiver consistent with [Sixth Amendment] guarantees of counsel in this life-or-death case." Townes cites his failure to object to "many objectionable actions by the Commonwealth" and his lack of knowledge of death penalty procedure as evidence of his inadequacy to represent himself.

We disagree with Townes. In his motion to dismiss and in supporting documents, he cited and showed familiarity with *Faretta* v. *California*, 422 U.S. 806 (1975), which recognized the constitutional right of one accused of a crime to represent himself. That case is itself a lesson in the dangers of pro se representation. Townes also stated that he had been advised of his right to effective assistance of counsel and of the potential pitfalls involved in pro se representation. Yet, Townes said, he knew of no reason to justify denying him the right to defend himself.

During the hearing on the motion, the trial court impressed upon Townes the necessity and desirability of representation by trained counsel, especially where "a person . . . is charged with an offense for which the penalty could be death." The court also likened an accused representing himself in a criminal case to a medical technician or orderly undertaking to perform a serious

surgical operation. While Townes agreed that the technician or orderly should not be permitted to undertake an operation, he insisted upon his right to act as his own counsel.

The court stated that it saw no reason to question Townes' competence to decide whether to represent himself. The court also stated that Townes seemed to understand "the seriousness of the situation" and the problems he would face "in undertaking to represent himself." The court then held that, in accordance with "the [*Faretta*] decision of the Supreme Court of the United States," Townes should be permitted to "appear pro se," with the assistance of standby counsel.

■ We think the trial court sufficiently inquired "into [Townes'] background and knowledge of the full ramifications of his decision for a valid waiver consistent with [Sixth Amendment] guarantees." Accordingly, we hold that the trial court did not err in permitting Townes to act as his own counsel.

■ Even so, Townes says, his pro se representation should at least constitute good cause for excusing his failure to observe the contemporaneous objection requirement of Rule 5:25 with respect to several points he now wants considered. The Supreme Court said in *Faretta*, however, that the "right of self-representation is not a license" to fail "to comply with the relevant rules of procedural and substantive law." 422 U.S. at 834-35 n.46. And in *Church* v. *Commonwealth*, 230 Va. 208, 213, 335 S.E.2d 823, 826 (1985), applying Rule 5:25 and citing *Faretta*, we said that "[a] defendant who represents himself is no less bound by the rules of procedure and substantive law than a defendant represented by counsel."

Accordingly, we will not consider those matters to which Townes failed to make proper objection in the trial court. *See Delong* v. *Commonwealth*, 234 Va. 357, 368, 362 S.E.2d 669, 675 (1987). Included in this category are the following questions, numbered as they are listed in Townes' opening brief:

11. Whether jurors should have been asked about their ability to apply the reasonable doubt standard and whether a juror who answered negatively should have been excluded for cause.

15. Whether the court erred in excluding evidence that Townes was not eligible for parole.

16. Whether the court erred in failing to instruct the jury that it had unbridled discretion to sentence Townes to life imprisonment.

17. Whether the jury should have been instructed on the lesser-included offenses of felony murder and second degree murder.

20. Whether the prosecution should be dismissed or the convictions reversed and the case remanded because of prosecutorial misconduct in:

a. Making improper use of withheld exculpatory evidence in cross-examination of defense witness Pope.

b. Failing to furnish scientific evidence in the form of photomicrographs.

e. Releasing to the media information prejudicial to the defense.

f. Invading the confidential relationship between Townes and his court-appointed investigator.

21. Whether the prosecutor's closing argument was improper to the extent it represented a "golden rule" argument and constituted a comment upon Townes' failure to testify.

22. Whether the independence of Townes' firearms expert was compromised.

24. Whether the court erred in excluding tape recordings of prior inconsistent statements of prosecution witnesses.

26. Whether instructions defining malice were proper.

27. Whether an instruction on capital murder was incomplete.

29. Whether the trial court erred in permitting jurors to question witnesses.

■ Further, Townes seeks to have us consider six questions raised by assignments of error he filed before Ms. Wyatt was appointed to represent him on appeal but not raised in the assignments she filed. She merely lists the questions in the opening brief and states she has set them forth at Townes' request.

We will not consider these questions. Once Ms. Wyatt was appointed to represent Townes, she controlled the case, and it was for her to decide what questions should be raised. In *Jones* v. *Baines,* 463 U.S. 745 (1987), the question for decision was "whether defense counsel assigned to prosecute an appeal from a criminal conviction has a constitutional duty to raise every non-frivolous issue requested by the defendant." *Id.* at 746.

The Court answered this question in the negative. The Court stated that none of its decisions suggests that an indigent defendant has "a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to press those points." *Id.* at 751. Such a view, the Court observed, "would disserve the very goal of vigorous and effective advocacy that underlies [counsel's duty to support his client's appeal to the best of his ability]." *Id.* at 754.

*Jones* states the issue in terms of *nonfrivolous* points. We have examined the six points Townes seeks to have us consider here. All are *frivolous*. Hence, *Jones* applies with even greater force to the points Townes wants considered.

Before concluding the discussion concerning waiver of counsel, it would not be amiss to say that Townes did a creditable job in representing himself in the trial court. While, as indicated, he may not have preserved every possible point for appeal, his trial performance was surprisingly competent for one lacking formal legal training.

*Denial of Speedy Trial*

█ Townes contends that his conviction should be reversed and the indictments dismissed for violation of his statutory right to a speedy trial. Townes cites Code § 19.2-243, which provides that one accused of a felony shall be forever discharged from prosecution if he is held in continuous custody and not tried within five months of a finding of probable cause. The provisions of this section do not apply, however, to delay caused by a continuance granted on the motion of the accused or by his concurrence in a motion of the Commonwealth, Code § 19.2-243(4), or to delay caused by the unavailability of a material witness due to sickness or accident, Code § 19.2-243(2).

Probable cause in Townes' case was found by the general district court on August 23, 1985, and he has since been held in continuous custody. On October 16, 1985, Townes, then represented by court-appointed counsel, moved for a continuance, which was granted by order entered the same date, and trial of the case was continued to December 4, 1985.

On December 4, 1985, Townes and his court-appointed counsel appeared in court on a number of motions, including a motion by

Townes that his counsel be dismissed and that he be allowed to represent himself. The court granted this motion and designated Townes' former counsel as standby counsel. Thereafter, a discussion took place concerning a trial date. Standby counsel suggested March 3, 1986, and everyone indicated assent. Then, on December 23, 1985, an order was entered embodying the actions taken by the court on December 4 and ending with the statement that "the trial of this matter is set for March 3, 1986, on motion of both parties by agreement."

On March 3, 1986, on Townes' motion, the case was continued to March 17. On March 14, the Commonwealth moved for a continuance because Dorothy Moore was ill and scheduled for surgery. Townes opposed the motion, but the court granted it and rescheduled trial of the case for April 22, 1986. Trial commenced on that date.

Townes argues that the first trial date set in his case was March 3, 1986, or some six months and eight days after the district court found probable cause, and that the March 3 date was "already in violation of the statute." Townes says we should ignore the continuance granted October 16, 1985, on his motion; he claims that when the October 16 motion was granted, no trial date had been set previously and, hence, no continuance cognizable under Code § 19.2-243 occurred.

We disagree with Townes. We think he is chargeable with the period from October 16 to December 4, or one month and 18 days. This had the effect of extending the five-month speedy trial period, which began August 23, 1985, to March 13, 1986, and the granting of Townes' motion for a continuance from March 3 to March 17 extended the allowable period to March 27. Then, if the continuance granted the Commonwealth due to the illness of Dorothy Moore is fully allowed, the period was extended to May 2, past the date Townes' trial began.

Townes argues, however, that a continuance of only fifteen days, or from March 17 to April 1, should have been allowed because of Moore's illness and, hence, that the continuance for one month and five days until April 22 was in violation of Code § 19.2-243. Townes bases this argument on the fact that the prosecutor represented to the trial court when requesting the continuance that Moore would be hospitalized for five days following surgery and required to recuperate at home for one week to ten days. A continuance is allowed under Code § 19.2-243(2) for the illness

of a witness, Townes points out, only for the period the witness is "prevented from attending."

 Townes, however, reads the Code section too narrowly. We think the language of the section allows a trial court discretion in determining the length of time a case should be continued due to the illness of a witness. Here, the trial court stated that the period should be reasonable and then sought to determine "the feasible trial date, taking into account the length of anticipated illness of this witness." We cannot say on this record that the trial court abused its discretion.

 But, in any event, another reason compels the conclusion that Townes was not denied his statutory right to a speedy trial. The order of December 23, entered well within the five-month period, expressly states that the March 3, 1986 trial date was set "on motion of both parties by agreement." This recitation imports verity and reflects judicial action constituting a continuance granted with the concurrence of both the prosecution and the accused. This continuance, from December 4 until March 3, extended the five-month period for three months less one day, or more than enough to satisfy the requirements of Code § 19.2-243 even if we ignore the continuance of October 16, 1985, and allow an extension of only fifteen days for the illness of Dorothy Moore.[3]

## DISCOVERY

*Moore's Selection of Two "Possibles"*

Townes contends that under the Supreme Court's decision in *Brady* v. *Maryland*, 373 U.S. 83 (1963), and this Court's decision in *Cox* v. *Commonwealth*, 227 Va. 324, 315 S.E.2d 228 (1984), he was entitled to have the Commonwealth furnish him any exculpatory evidence it had in its possession. Then, citing *Lomax* v. *Commonwealth*, 228 Va. 168, 173, 319 S.E.2d 763, 766 (1984), Townes says he was entitled to receive exculpatory evidence in

---

[3] Townes argues that he did not agree to the order of December 23, 1985, but, rather, that he signed it as "[s]een and objected to." As noted in the text, however, the order of December 23 incorporated a number of rulings of the trial court, some granting and others denying relief Townes had requested. Because of the general nature of Townes' objection, we will recognize it as applicable only to the relief denied. Furthermore, the recital in the order of December 23, 1986, with respect to agreement on the trial date, not only imports verity but also is supported by the record.

sufficient time to use it " 'to explore and develop . . . evidence.' " Yet, Townes complains, although he filed a motion for discovery of exculpatory evidence as early as November 26, 1985, and discovery was ordered December 23, 1985, it was not until the first day of trial on April 22, 1986, that the prosecution gave him information showing Moore had selected two "possibles" in the photoarray of May 29, 1985.

Townes says that the information concerning Moore's selection of two "possibles" was material and that the delay in furnishing it prejudiced his defense. We disagree. In the first place, we question whether the information was exculpatory. As the Attorney General points out, while Moore's dual selection was a tentative identification of Townes, it was not a positive identification of the other person. Furthermore, the jury might well have believed that Moore's action in selecting two "possibles" displayed commendable caution on her part. Indeed, when asked at trial why she selected two photographs, she said it was because she "could better [make an identification] in a lineup rather than from the photos."

Second, Townes was furnished the information six days before Moore testified.[4] This was ample time for Townes to plan how to put the information to the one use for which it might have been helpful to him — the cross-examination of Moore. He did cross-examine Moore about her selection of two "possibles," but he failed to shake her identification of him as the person she saw in the Majik Market on the night of Goebel's murder.[5]

*Crime Scene Evidence*

Townes complains that the prosecution also failed to furnish until the first day of trial exculpatory evidence in the form of seven credit card receipts found at the crime scene for purchases of gasoline made during Goebel's shift on the night of her murder.

---

[4] The record indicates that Townes may have had the information before it was furnished to him by the prosecution on April 22, 1986.

[5] Townes says he was also prejudiced by the delay in securing the information because he may have presented it to the trial court in the hearing on his motion to suppress Moore's identification testimony. But, in a hearing on the same subject on the first day of trial, the court stated that the information "would have made no difference" on the outcome of the motion to suppress "as [the information] goes [only] to the weight of [Moore's] testimony."

Townes says he could have used the names and addresses of the purchasers as "potential witnesses who may or may not have been present during the course of Mrs. Moore's alleged presence."

The record reveals, however, that Townes was given information concerning the credit card purchases well in advance of the first day of trial. Furthermore, the representation was made to, and accepted by, the trial court that the last of the seven purchases was made at 12:20 a.m. during Goebel's shift, or about one and one-half hours before Moore said she arrived at the Majik Market; on this basis, the trial court found that the information concerning the credit card receipts "would have [had] no exculpatory value whatsoever" to Townes. This finding was plainly correct. *See Lowe* v. *Commonwealth*, 218 Va. 670, 678-79, 239 S.E.2d 112, 117-18 (1977).

*Juvenile Court Records*

Townes sought by way of a motion for discovery to have the Commonwealth provide him with records of the Juvenile and Domestic Relations District Court of Virginia Beach pertaining to Dennis Brezler and Dorothy Moore. Townes wanted Brezler's conviction record in Juvenile Court and certain show cause orders entered against Moore for "failure to live up to [the] terms and conditions . . . of suspended sentence relating to payment or repayment . . . of funds." Townes says he needed these records to show that Moore and Brezler had agreements with the Commonwealth in regard to their testifying against Townes.

The trial court held that Brezler's conviction record as a juvenile would be inadmissible[6] and that any convictions as an

---

[6] This holding may have been erroneous in light of *Davis* v. *Alaska*, 415 U.S. 308 (1974). There, the Supreme Court ruled that a defendant's right of confrontation is paramount to the state's policy of protecting juvenile offenders and that a defendant may cross-examine a witness about his juvenile record in an effort to show bias. Although we do not know whether Brezler had a record in juvenile court and, if so, whether it reflected misconduct as a juvenile, we will assume those facts and also assume, without deciding, that it was error to deny Townes the right to cross-examine Brezler about his juvenile record. Any such error, however, was harmless beyond a reasonable doubt. *See Fulcher* v. *Commonwealth*, 226 Va. 96, 99, 306 S.E.2d 874, 876 (1983) (applying *Davis* v. *Alaska*). The Commonwealth brought out on Brezler's direct examination that he had been convicted of eighteen felonies involving forgery and uttering and four other felonies involving possession of drugs, possession of drugs with intent to distribute, unlawful wounding, and burglary. If the jury chose to believe Brezler despite that sort of record, as it was entitled to do, the addition of a juvenile record could have made no difference.

adult would be included on the "overall criminal record" already provided Townes by the Commonwealth. The court further held that the show cause orders issued against Moore would be inadmissible. Concerning the possibility of agreements involving Moore's and Brezler's testimony, the court stated it had previously directed the Commonwealth to provide Townes with information of any such agreements. The court denied Townes' motion for discovery of the court records. We do not think this denial constituted reversible error.

## GUILT PHASE

## MATTERS PERTAINING TO THE JURY

### The Jury Selection Process

Townes filed a motion in which he attacked the jury selection process in the City of Virginia Beach. In the motion, Townes alleged that "the jury pools are significantly underrepresentative of Blacks, young people, and other cognizable social groups."

In argument on the motion, Townes stated there were 227,454 whites and 26,266 blacks in the City of Virginia Beach, according to the 1980 census, and yet blacks had not had "a chance to serve as jurors." Townes also told the court that the jury list for his trial contained the names of 68 persons 55 years of age or older and 21 persons aged from 25 to 30.

Noting that jurors in the city and throughout the state are selected at random from voting lists, and, therefore, that the racial or age makeup of any given jury panel might or might not reflect the racial or age mix of the population, the trial court ruled that Townes had failed to show any constitutional basis for invalidating the jury selection process. Accordingly, the court denied Townes' motion.

We find no error in the trial court's ruling. Townes failed to make a prima facie showing of systematic exclusion of members of distinctive social groups from juries in Virginia Beach, and, hence, was not entitled to any relief. *Watkins* v. *Commonwealth*, 229 Va. 469, 492, 331 S.E.2d 422, 438-39 (1985), *cert. denied*, 475 U.S. 1099 (1986).

*Striking of Prospective Jurors Opposed to the Death Penalty*

Townes argues that the trial court should not have allowed prospective jurors to be questioned about their opposition to the death penalty. He also argues that the court should not have struck for cause any prospective juror who indicated opposition to the death penalty, even if the opposition was unalterable.

■ Townes acknowledges that the Supreme Court in *Lockhart* v. *McCree*, 476 U.S. 162 (1986), and this Court in *Pruett* v. *Commonwealth*, 232 Va. 266, 277-78, 351 S.E.2d 1, 8 (1986), *cert. denied*, 482 U.S. ___, 107 S.Ct. 3220 (1987), expressly rejected the arguments he now advances. Yet, he says, he continues to believe that the exclusion of jurors opposed to the death penalty is discriminatory and produces juries less fair and less reliable than juries in non-capital cases. He offers us, however, no persuasive reason to change our views on the subject, and we reject his arguments. *See Delong*, 234 Va. at 360-61, 362 S.E.2d at 670-71.

■ Alternatively, Townes argues that we should remand his case for a hearing to determine whether the Commonwealth's Attorney improperly used peremptory strikes to exclude members of the jury panel who voiced "mild opposition" to the death penalty but survived being struck for cause. Townes cites *Batson* v. *Kentucky*, 476 U.S. 1023 (1986). But *Batson* involved the use of peremptory strikes to exclude black persons from juries, and we think that decision should be limited to the factual basis upon which it was decided.

■ Townes also cites *Witherspoon* v. *Illinois*, 391 U.S. 510 (1968), but that case prohibits imposition of the death penalty by a jury from which persons have been excluded *for cause* based upon their *general objections* to the death penalty. The case does not stand for the proposition that a prosecutor may not use peremptory strikes to exclude persons voicing "mild opposition" to the death penalty. Furthermore, in *Brown* v. *Commonwealth*, 212 Va. 515, 517, 184 S.E.2d 786, 787-88 (1971), we rejected the argument that a prosecutor may not use peremptory strikes "to eliminate . . . veniremen who [have] any reservations about or scruples against the death penalty."

*Preset Standards for Imposing the Death Penalty*

 Townes argues that the trial court sua sponte should have determined whether any prospective jurors had preset standards for opposing the death penalty. Townes, however, fails to point to any case or rule which imposes upon a trial court the duty to make such an inquiry. The court complied with the provisions of Rule 3A:14 in conducting the voir dire of prospective jurors, and that is all the law requires.

*Prospective Juror Castagna*

Townes argues that the trial court should have excluded for cause prospective juror Richard Castagna, who ultimately was selected to serve as an alternate juror. In his voir dire responses, Castagna indicated a firm belief in the death penalty. In response to one question, Castagna told Townes: "If the evidence . . . proves that you meet the [criteria] for execution and you [are] found guilty, there would be no question that [execution] is the appropriate punishment."

 Upon further questioning, however, Castagna stated that his personal belief was "a separate issue" and that he was capable of following "the instructions that are given." The trial court found that Castagna "could and would follow the Court's instructions . . . and . . . would fairly consider and vote for the sentence of life imprisonment if upon those instructions he felt that was the appropriate verdict." We find no error in the trial court's refusal to strike Castagna for cause.

*Voir Dire Questions Regarding Defendant's Failure to Testify*

Townes contends that the trial court should have struck for cause four prospective jurors who indicated in response to questions asked by Townes on voir dire that they "wanted" or "expected" him to testify. In response to further questioning by the trial court and the prosecutor, all four stated they would decide the case on the evidence presented and the law as enunciated in the court's instructions. Specifically, each responded affirmatively when asked whether he or she understood that Townes did not have to testify and that his failure to testify could not be considered by the jury.

■■■ It would be unrealistic to think that jurors do not notice when defendants fail to testify. *See Carter* v. *Kentucky*, 450 U.S. 288, 301 n.18 (1981). And it is not surprising that jurors would want or expect a defendant to testify; any conscientious juror naturally would want all the help he or she could get in deciding a case. It should not be grounds for a per se exclusion, therefore, when prospective jurors on voir dire indicate their wants or expectations in this respect.

The real test is whether jurors can disabuse their minds of their natural curiosity and decide the case on the evidence submitted and the law as propounded in the court's instructions. With respect to the four prospective jurors involved in this challenge, it is clear they fully satisfied this test. Hence, the trial court did not err in refusing to strike them for cause.

*Newspaper Publicity — Effect on Prospective Juror Cromwell*

On the second day of trial, while the court was still engaged in selecting a jury, *The Virginian Pilot*, a Norfolk newspaper, published an article about Townes and his case. The article mentioned a charge against Townes of possession of a firearm by a convicted felon, a charge which had been severed from the capital murder trial.

■■■ One prospective juror, Fremont Cromwell, admitted he had read the article, but he said "the only thing" he remembered was "the defendant was going to represent himself." Townes contends the trial court should have stricken Cromwell for cause. We disagree. The trial judge noted that the reference in the article to a prior conviction was obscure, and he satisfied himself that Cromwell remembered nothing more about the article than the fact Townes "was going to represent himself." In these circumstances, it was not error to refuse to exclude Cromwell for cause.

## SUPPRESSION OF IDENTIFICATION TESTIMONY

Townes contends the trial court erred in refusing to suppress the identification testimony of Dorothy Moore and Herman Christenbury. Townes says the in-court identification by these witnesses was tainted by undue suggestiveness and irregularities in pretrial identification procedures.

■ Townes first argues the identification process was tainted because he did not have counsel present when Moore identified him in the lineup conducted on June 5, 1985, or when Herman Christenbury identified him in a lineup conducted on August 21, 1985. The record shows affirmatively, however, that the public defender, who was then representing Townes, was present at the June 5 lineup; the public defender said he was present, and Detective Baum confirmed his presence. The only contrary indication is Moore's testimony that only she and Detective Baum were in the room when she identified Townes in the lineup. But she also said the door "was open when the lineup" was held and that there were people "looking in the door."

■ With respect to Christenbury's lineup identification, the trial court found that Townes did not have counsel present, and the court suppressed the evidence of that identification. Townes argues that the court should have gone further and suppressed Christenbury's in-court identification as well. The court found, however, that Christenbury's in-court identification derived from a source sufficiently independent of the uncounseled lineup to remove any taint resulting therefrom. We think that the record fully supports this finding and that it is also supported in law. *See United States* v. *Wade*, 388 U.S. 218, 241 (1967).

Townes also argues that Moore's in-court identification was tainted because she picked two suspects, including Townes, as "possibles" in the photoarray of May 29, 1985, but of the two only Townes appeared in the live lineup on June 5. Townes cites *Foster* v. *California*, 394 U.S. 440 (1969), for the proposition that where multiple identification procedures are employed and the defendant is the only "overlapping face," an unduly suggestive identification occurs.

■ *Foster*, however, is inapposite. There, three live confrontations took place. In the first, the accused "stood out from the other two men by the contrast of his height and by the fact that he was wearing a leather jacket similar to that worn by the robber." *Id.* at 443. When the lineup did not produce a positive identification, the witness was allowed to view the accused in a one-to-one confrontation. Still without a positive identification, the police arranged a third lineup in which the accused was the only person who had also participated in the first lineup. The Court found the procedure unfair, judged by the totality of the circumstances. *Id.* at 442. It is not a denial of due process, however, that an accused

happens to be "the only individual to appear in both [a] photospread and [a] line-up." *United States* v. *Portillo*, 633 F.2d 1313, 1324 (9th Cir. 1980).

Townes complains that the in-court identification by Moore and Christenbury was also tainted because Moore was shown a photograph of the June 5, 1985 lineup about two weeks before the March 3, 1986 trial date and Christenbury was shown a photoarray which included Townes' photo before the August 21, 1985 lineup. Townes was unable, however, to point to any evidence that the police prompted either witness to pick Townes as the person each had observed at different times in the scenario of this case. It is not impermissible per se for a witness to be shown a photoarray before attempting to identify a suspect in a lineup or an accused at trial. *See Bowring* v. *Cox*, 320 F.Supp. 688, 690 (W.D. Va. 1970).

Townes' final identification complaint is that undue suggestiveness pervaded a confrontation at his preliminary hearing when, as the only person dressed in prison garb, he was identified by Moore and Christenbury. Townes acknowledges that the trial court suppressed the evidence of the preliminary hearing identification, but he argues that the incident contributed to a totality of circumstances which produced a tainted in-court identification.

The criteria for determining whether a particular identification is reliable were listed by the Supreme Court in *Neil* v. *Biggers*, 409 U.S. 188 (1972):

[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199-200. *See also McCary* v. *Commonwealth*, 228 Va. 219, 233, 321 S.E.2d 637, 644 (1984). Considering these criteria and judging the incident at the preliminary hearing in the totality of the circumstances present in this case, we have no difficulty in saying that the incident was insufficient to taint Moore's and Christenbury's in-court identification of Townes. *See Delong*, 234 Va. at 366-67, 362 S.E.2d at 674.

Townes contends further that once the trial court refused to suppress the identification testimony of Moore and Christenbury, the court should have appointed an expert to aid the defense in explaining to the jury "such tricks of the mind as were or might have been employed by the police in this case." Townes grounds this contention upon *Ake* v. *Oklahoma*, 470 U.S. 68 (1985).

*Ake* requires that the state provide an indigent defendant in a capital case the assistance of a competent psychiatrist when the defendant makes "a threshold showing to the trial court that his sanity is likely to be a significant factor in his defense." *Id.* at 82. *Ake* does not deal with identification testimony or with what Townes calls an "identification expert," and we cannot find in the Supreme Court's opinion any requirement that the state provide an indigent defendant the assistance of such an expert. "[T]he fact that a particular service might be of benefit to an indigent defendant does not mean that the service is constitutionally required." *Ross* v. *Moffitt*, 417 U.S. 600, 616 (1974).

## DENIAL OF SUBPOENA

On May 2, 1986, the last day evidence was taken in the guilt phase of the trial, Townes advised the court he had received information which he thought would affect the credibility of Lauren Ponton, who had testified earlier as a witness for the Commonwealth. Lauren Ponton was the wife of George Ponton, who had testified for the Commonwealth about his dealings with Townes concerning the Star .45 caliber weapon.

Townes attempted to cast suspicion upon George Ponton in the murder for which he, Townes, was on trial. During cross-examination of Ponton, Townes brought out that a larger-than-usual deposit had been credited to Ponton's bank account on April 15, the Monday following Goebel's murder. Ponton explained the extra money by saying his wife had worked overtime.

Lauren Ponton testified that her paycheck had been included in the deposit credited April 15, but she said the deposit had actually been made late on Friday, April 12, before the Saturday night murder of Goebel. She stated that according to bank procedures, the deposit was not credited until the next banking day. She said she received the paycheck for a new job she commenced March 23, 1985.

Townes represented to the court that the information that he had received would show Lauren Ponton had commenced her new job in January 1985, rather than March. The employment records of the firm which employed Lauren Ponton were in Richmond. Townes asked the court to issue a subpoena to compel production of the records and the appearance of their custodian. The court denied the request, stating it was not practicable "[t]o subpoena someone and expect them to arrive here from Richmond in time to testify in this trial today." The court agreed to hear the witness if he or she arrived before the evidence was concluded "in this case today."

We do not think the trial court erred in denying Townes' request. Obviously, to grant the request would have required a continuance on the last day evidence was to be taken in the case. Whether a continuance should have been granted was a matter within the trial court's discretion. *Parish* v. *Commonwealth*, 206 Va. 627, 631-32, 145 S.E.2d 192, 195 (1965). Considering the lateness of Townes' request and the questionable value of the information he sought, we find no abuse of discretion.

## ROBBERY INSTRUCTION

Townes contends that the trial court's instruction defining robbery was incomplete and defective. The instruction stated that the defendant was charged with robbery and that the Commonwealth must prove beyond a reasonable doubt:

(1) That the defendant intended to steal; and
(2) That United States Currency was taken; and
(3) That the taking was from Virginia Goebel or in her presence; and
(4) That the taking was against the will of the owner or possessor; and
(5) That the taking was accomplished by the threat or presenting of a firearm.

Townes says that "[t]o have been sufficient, the instruction should have read: 'That United States Currency was taken — by defendant [or on his behalf].'" Under the instruction as granted, Townes argues, the jury could have found him guilty of robbery if it believed that he went to the Majik Market intending to commit

robbery and that he killed Goebel, but that he fled without taking anything and someone else later entered and took the money.

██ The difficulty with this argument is that it is not supported by any evidence. Only speculation would lead a jury to adopt the scenario Townes suggests, and there was no room in this case for speculation. Under the evidence and the robbery instruction in question, if the jury believed Townes murdered Goebel, it could not "find the element of contemporaneous robbery [by Townes] lacking." *LeVasseur* v. *Commonwealth*, 225 Va. 564, 590, 304 S.E.2d 644, 658 (1983), *cert. denied*, 464 U.S. 1063 (1984).

## SUFFICIENCY OF THE EVIDENCE TO CONVICT

Townes contends that the evidence was insufficient as a matter of law to sustain his convictions. He acknowledges that the evidence, viewed in the light most favorable to the Commonwealth, indicated that he was at the scene of the crime on the night of the murder and that it was his weapon which killed the victim. The evidence was insufficient, however, he says, to show that he was the triggerman and that, if he was, the killing was with premeditation. And there was no evidence at all, Townes maintains, that he took any money from the Majik Market and, hence, nothing to connect him to the robbery.

██ We agree with Townes that where the evidence is circumstantial, it must be consistent with guilt and inconsistent with innocence and must point unerringly to the defendant as the guilty party. *Cook* v. *Commonwealth*, 226 Va. 427, 433, 309 S.E.2d 325, 329 (1983). We disagree with Townes, however, that his convictions are based wholly upon circumstantial evidence. While there was considerable circumstantial evidence presented to the jury, there was also direct evidence. And we think the evidence as a whole is sufficient to sustain Townes' convictions.

Townes concedes, as, indeed, he must, that the evidence placed him at the scene of the crime on the night in question and established that it was his gun which killed Goebel. We think the evidence also permitted the jury to find that it was Townes who fired the fatal shot. Although other evidence supports this finding, the uncontradicted testimony of Dennis Brezler was sufficient by itself to identify Townes as the triggerman.

The evidence also supports the jury's finding that the killing was deliberate and premeditated. The testimony of the medical

examiner showed that the weapon was placed against Goebel's head when the fatal shot was fired. This alone, although there is more, is enough to establish that the shot was fired deliberately and with premeditation.

■ Further, we are of opinion that the evidence justified the conclusion that the robbery took place contemporaneously with the murder. As indicated in our earlier discussion concerning the court's instruction on robbery, only speculation supports Townes' theory that he left the Majik Market without taking anything and that someone else later entered the store and stole the money an audit showed was missing. The verdicts in this case are supported by evidence rather than by speculation, bringing them within the rule that where a murder and a robbery are closely related in time, place, and causal connection, they become parts of a single criminal enterprise. *LeVasseur*, 225 Va. at 590-91, 304 S.E.2d at 658; *Linwood Earl Briley* v. *Commonwealth*, 221 Va. 532, 542-44, 273 S.E.2d 48, 54-56 (1980), *cert. denied*, 451 U.S. 1031 (1981).

## SENTENCING PHASE

### Constitutionality of Death Penalty Statutes

■ Townes acknowledges that this Court has rejected all challenges to the constitutionality of Virginia's death penalty statutes. *See Pope* v. *Commonwealth*, 234 Va. 114, 121-22, 360 S.E.2d 352, 357 (1987) (listing cases rejecting constitutional challenges). *See also Delong*, 234 Va. at 360, 362 S.E.2d at 674. Townes states, however, that he "wishes to continue to claim that the death penalty, particularly by electrocution, is cruel and unusual punishment," so that he will not be deemed to have waived the point in the event the Supreme Court or this Court reverses its rulings. We will adhere to our rulings, but permit Townes to save the point.

■ Townes also contends that "the death penalty as presently administered constitutes a violation of equal protection because of the greater likelihood that the penalty will be sought and, if sought, administered" when, as here, the victim is white and the defendant is black. Townes recognizes that this sort of challenge was rejected by the Supreme Court in *McCleskey* v. *Kemp*, 481 U.S. ____, 107 S.Ct. 3141 (1987), and we reject it here.

*Use of Perjured Testimony*

Townes contends that the Commonwealth knowingly used perjured testimony in the sentencing phase of this case and, therefore, that he is entitled to a new sentencing hearing. Townes' contention involves the testimony of Arthur R. Beasley, a witness called by the Commonwealth.

Townes claims Beasley testified in the sentencing phase that during a robbery in 1976, Townes "shot him in the back four times." After Townes was sentenced in this case, he secured medical records which showed that Beasley had been shot only twice, once in the wrist and once in the shoulder.

Townes says Beasley's false testimony was material in two respects. First, shooting someone in the back is considered more reprehensible than a face-to-face shooting. Second, the testimony tainted the whole story Beasley told the jury. Townes maintains there is a reasonable probability that his sentence would have been different without Beasley's false testimony.

We disagree with Townes. Indeed, we think he strives mightily to make a mountain out of a molehill.

In the first place, Beasley did not testify he had been shot in the back. Beasley was a taxicab driver, and Townes and another person accosted him with a sawed-off shotgun and forced him into the rear of his cab. After driving around the Norfolk area for several hours, the assailants took Beasley to a field in Virginia Beach and ordered him out of the cab. Beasley testified in the court below that when he got out, "the one behind me shot me." Hence, the statement that Beasley was "shot . . . in the back" comes out of Townes' mouth, not Beasley's.

Beasley did testify he had been shot four times. While this was not altogether true, the medical records, secured after the trial below, showed that Beasley had suffered four wounds, consisting of two entrance wounds and two exit wounds.

Furthermore, there is no evidence the prosecutor in the trial below knew of the discrepancy between Beasley's testimony that he had been shot four times and the facts set forth in the medical records Townes secured after trial. The 1976 indictment charging Townes with maiming Beasley and the order of conviction were introduced into evidence by the prosecution in the trial below, and they contain no information concerning the number of times Beasley was shot. When Townes raised the question of perjured testi-

mony, the prosecutor represented to the court that police reports of the 1976 crime showed only that Beasley had been "shot at a number of times."

 In our opinion, there is little likelihood that knowledge of the alleged perjury would have affected the jury in its determination of the appropriate sentence in this case. Townes, who entered a plea of guilty to the 1976 charge, did not cross-examine Beasley in the trial below or otherwise question the seriousness of the 1976 offense.

Under the circumstances, we think it was wholly immaterial that Beasley was not actually shot four times. The facts remain that he was shot twice, suffering four wounds, and left for dead in a ditch. The parting remark of one of the assailants was that "[t]here's a bunch of snakes in that hole" and they are "[g]oing to eat him."[7]

*Future Dangerousness*

Under Code §§ 19.2-264.2 and -264.4(C), the death penalty may not be imposed unless the Commonwealth proves beyond a reasonable doubt, and the court or jury finds, (1) that there is a probability the defendant would commit criminal acts of violence which would constitute a continuing serious threat to society, or (2) that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or aggravated battery to the victim. We have termed these criteria "dangerousness" and "vileness." *Smith* v. *Commonwealth*, 219 Va. 455, 477, 478, 248 S.E.2d 135, 148, 149 (1978), *cert. denied*, 441 U.S. 967 (1979).

As noted previously, the jury based its sentence of death upon the "dangerousness" predicate. Townes contends the Commonwealth failed to prove "dangerousness" beyond a reasonable doubt.

The evidence in the sentencing phase shows that Townes had been convicted in January 1975 of twenty-two offenses involving

---

[7] Townes contends the trial court erred in denying him a new trial on the basis of after-discovered evidence when he brought to light the medical records which showed Beasley had lied in the sentencing phase of the trial below. Because, as we have noted in the text, there is little likelihood that knowledge of the alleged perjury would have affected the jury in its determination of sentence, the trial court did not err in denying Townes a new trial.

forgery and uttering, three robbery offenses and one firearms offense in May 1976, an additional robbery and a maiming offense in August 1976, and a felony escape offense in February 1977.

The Commonwealth presented the testimony of Arthur Beasley, previously outlined in this opinion, concerning his robbery and maiming on January 9, 1976, by Townes and an accomplice. The Commonwealth also called two former police officers who testified they had participated in a stake-out of a Norfolk theater on January 24, 1976, in an area where "[t]here were robberies going down." Townes was apprehended after robbing the theater cashier at gunpoint.

Townes says that the testimony of Beasley and the two police officers "added nothing but prejudice and passion to the evidence." He states further that when the record is stripped of this passion and prejudice, all that remains are "convictions for crimes almost entirely over ten years old, almost all for forgery and uttering, only one involving alleged injury to a person, and *nothing else* about the man to be sentenced."

Townes would have us ignore, however, that his lack of criminal activity after 1976 resulted not from any reformation on his part but from his incarceration in the Virginia State Penitentiary until October 1983. Even while in the penitentiary, his conduct was not praiseworthy; he was convicted of escape in 1977.

In addition to the evidence of Townes' past criminal conduct, the jury was entitled to consider the circumstances surrounding his robbery and murder of Goebel in deciding whether it was probable he would commit criminal acts of violence in the future. Code § 19.2-264.4(B). The circumstances surrounding this latest offense in Townes' saga of crime displays a person who killed in cold blood, probably for no other reason than to seal permanently the lips of a potential witness. The combination of this extremely violent act with the prior acts of violence committed by Townes proves beyond a reasonable doubt the "dangerousness" predicate upon which the jury based its sentence of death.

## Totality of Circumstances

Townes contends that his convictions and sentences resulted from an unfair and unreliable trial. He states that numerous errors were committed during the trial and, in addition, he represented himself. He says that while he may not have preserved

some errors by failing to object, all the errors he has tried to assert form the totality of circumstances of this case and demonstrate the unfairness and unreliability of his trial. To impose the death penalty after such an unfair proceeding, Townes concludes, would constitute cruel and unusual punishment.

■ We disagree with Townes. While he might have had a *better* trial had he not represented himself, we think he had a *fair* trial. As noted previously in this opinion, Townes did a creditable job in representing himself in the trial court. The trial judge was patient and considerate of Townes and gave him a great deal of leeway in all aspects of the trial. The court also appointed standby counsel for Townes, provided him with a private investigator, and furnished him with an expert in firearms. The prosecutor was also considerate of Townes and took no advantage of the fact he was representing himself.

■ Townes did fail to preserve a number of errors. Experienced lawyers sometimes make the same mistake in trial, but this does not necessarily mean the trial is unfair or unreliable. Besides, Townes' decision to represent himself was his own, made freely and voluntarily, and if he made mistakes in not objecting on occasion, he has no one to blame but himself.

We have found no reversible error in any assignment of error previously discussed. We now find that the cumulative effect of the alleged errors did not render Townes' trial unfair or unreliable.

## PROPRIETY OF THE DEATH SENTENCE

Under Code § 17-110.1(C), this Court, in addition to considering the errors assigned on appeal, must determine (1) whether "the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor," and (2) whether the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Under Code § 17-110.1(D), "[i]n addition to the review and correction of errors in the trial of the case," this Court may commute the death sentence to imprisonment for life.

### Passion and Prejudice

■ As noted in the discussion on "dangerousness," Townes says that the testimony of Arthur Beasley injected passion and

prejudice into the case. We do not think, however, that Beasley's testimony had this effect or that any other incident or "arbitrary factor" influenced the jury in the sentence it fixed.

*Excessiveness and Disproportionality*

Townes argues that neither his crime nor his record supports the death penalty when compared with other cases. Accordingly, Townes maintains, his sentence ought to be commuted to life imprisonment.

In determining in a given case whether a sentence of death is excessive or disproportionate, we inquire whether "juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes." *Stamper* v. *Commonwealth*, 220 Va. 260, 284, 257 S.E.2d 808, 824 (1979), *cert. denied*, 445 U.S. 972 (1980). To aid us in making this determination, we have accumulated "the records of all capital felony cases . . . as a guide in determining whether the sentence imposed in the case under review is excessive." Code § 17-110.1(E). Where, as here, the basis of imposition of the death sentence is "dangerousness," we give particular emphasis to those cases where the death penalty was based upon the same predicate. *Peterson* v. *Commonwealth*, 225 Va. 289, 301, 302 S.E.2d 520, 528, *cert. denied*, 464 U.S. 865 (1983).

Considering both Townes and the crime he committed, and comparing his case with similar cases, we are satisfied that juries in this jurisdiction generally approve the supreme penalty for criminal conduct comparable to Townes'. Indeed, this case closely resembles *Peterson, supra*, and *Pope* v. *Commonwealth, supra*.

Finding no error in the record or any reason to commute the death sentence, we will affirm the judgments of the trial court.

*Affirmed.*