COURT OF APPEALS OF VIRGINIA


Present:    Judges Humphreys, AtLee and Raphael
Argued by videoconference


GREGORY LEON HAMMER

  v.       Record No. 0819-20-3

COMMONWEALTH OF VIRGINIA                                    OPINION BY
                                                   JUDGE STUART A. RAPHAEL
GREGORY LEON HAMMER                                    JANUARY 18, 2022

  v.       Record No. 1033-20-3

COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF THE CITY OF WAYNESBORO
                          Paul A. Dryer, Judge

            FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
                        Thomas J. Wilson IV, Judge

        A. Gene Hart, Jr. (A. Gene Hart, Jr., P.C., on briefs), for appellant.

        Timothy J. Huffstutter, Assistant Attorney General (Mark R. Herring,[1]
        Attorney General, on briefs), for appellee.


        Appellant Gregory Leon Hammer appeals his convictions in the Circuit Court of the City

of Waynesboro for abduction, felony eluding, and driving after being declared a habitual

offender.  Hammer asserts that the trial judge improperly allowed the prosecution to pursue the

abduction charge after orally allowing a *nolle pros*.  We find that Hammer failed to preserve that

objection and reject his claim that the oral *nolle pros* deprived the court of jurisdiction to permit

the abduction charge to be reinstated.  We also reject Hammer's claim that the trial court should

have found the police officer's defendant-identification testimony "inherently incredible."

---

[1] Jason S. Miyares succeeded Mark R. Herring as Attorney General on January 15, 2022.

Hammer also appeals the decision of the Circuit Court of Rockingham County to revoke Hammer's probation (and to reimpose the sentence on Hammer's earlier convictions in that court) on account of the Waynesboro convictions. Because the Waynesboro court did not err in imposing the convictions, the Rockingham court did not err in finding Hammer in violation of the terms of his supervised probation.

So we affirm both judgments.

## I. BACKGROUND

In May 2012, the Circuit Court of Rockingham County convicted Hammer on charges of grand larceny, felony eluding, reckless driving, driving as a habitual offender, two counts of resisting arrest, and possession of a Schedule I or II controlled substance. The sentencing order imposed twenty years and eighteen months of incarceration, with seventeen years and nineteen months suspended, conditioned on Hammer's successfully completing supervised probation upon his release.

The events giving rise to the Waynesboro convictions occurred six years later, while Hammer was still on supervised probation in Rockingham County. Consistent with the standard of review when a criminal appellant challenges the sufficiency of the evidence, we recite the evidence below "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Commonwealth v. Cady*, ___ Va. ___, ___ (Oct. 28, 2021) (citation omitted).

On the evening of November 27, 2018, Officer Brandon Mawyer was patrolling in his police cruiser in the City of Waynesboro when he received a "be on the lookout" alert for a "possibly-abducted female . . . named Morgan Hammer." The alert said that Morgan may have been abducted by Hammer—her husband—and "that they may be en route to their apartment" in Waynesboro.

Mawyer was familiar with Hammer and his wife. He had seen Hammer "up close and personal" while working on other matters. He had examined photographs of Hammer, including pictures of Hammer's tattoos. Mawyer had also spoken to both spouses during a traffic stop. Knowing where they lived, Mawyer drove to the Hammers' apartment in Waynesboro, but the lights were off and no one was home.

Believing that Hammer might be returning home from Rockingham County, Mawyer drove to the Waynesboro city limits on Route 340. He pulled into a driveway on the side of the road and waited there with his lights off, the rear of his patrol car facing north towards Rockingham County, to minimize the chance of being spotted by someone approaching from that direction. Although it was nighttime, the road was illuminated by a streetlight not more than five feet from where Mawyer positioned his car. The road was illuminated even more by a second streetlight a little farther away. A photograph showing the illuminated road was introduced into evidence as the Commonwealth's Exhibit 2. With that lighting—and his patrol car facing south, towards Waynesboro—Mawyer had a clear and unobstructed view of the road from his driver's side window.

Within about a minute, Mawyer spotted a car approaching rapidly from behind. Mawyer activated his radar and clocked the vehicle doing sixty-three miles an hour in the thirty-five-mile-an-hour zone.

As the vehicle passed him, Mawyer saw Hammer behind the wheel and Morgan in the passenger seat, looking out the window towards him. Hammer leaned forward—looking around Morgan to see into Mawyer's patrol car—and "actually made eye contact" with Mawyer. Mawyer recognized both immediately. Mawyer also saw the distinctive tattoo on Hammer's hand as Hammer held the steering wheel.

Mawyer activated his emergency lights and siren and commenced pursuit. Hammer fled, accelerating to speeds over 100 mph, driving the wrong way on a divided highway and forcing an oncoming car off the road to avoid a head-on collision. Because Mawyer had positively identified Hammer, and to reduce the risk of an accident, Mawyer slowed down and turned off his emergency equipment, continuing to follow at a safe distance. After entering Augusta County, Hammer briefly "crash[ed]" and continued to drive erratically, on and off the road. An Augusta sheriff's deputy joined the pursuit.

After running out of gas, Hammer's car came to a stop in Fishersville. Mawyer observed for about ten seconds as Hammer exited his car, ran down the embankment, climbed over a barbed-wire fence, and disappeared into the woods behind. Hammer was wearing a black leather jacket. Because he could not see Morgan, Mawyer rushed to the Hammers' car, finding her alive on the passenger floorboard. Mawyer then ran after Hammer, but by then Hammer had escaped into the woods beyond.

Mawyer returned to check on Morgan. She was "scared," telling Mawyer that she'd been abducted. She also gave a written statement about what had happened.

The next morning, Mawyer received a be-on-the-lookout alert for a car stolen in Fishersville, "fairly close" to where Hammer had fled on foot. Mawyer and another officer drove to the Hammers' apartment, finding the stolen car parked across the street. After obtaining a search warrant, the officers found Hammer inside the apartment. They also found the key to the stolen car and the black leather jacket that Mawyer had seen Hammer wearing when he escaped.

Hammer was indicted by a Waynesboro grand jury on charges of abduction, felony eluding, and driving after being declared a habitual offender. He elected to represent himself at trial, with backup counsel appointed in case Hammer changed his mind.

- 4 -

On the morning of trial, Morgan failed to appear, having been subpoenaed and despite an outstanding capias for a prior failure to appear. Hammer said that he "hope[d]" his wife would "show up," but he predicted that "the victim" would not, no matter how long the case might be continued. When the trial judge said he would not continue the abduction charge, the prosecutor orally moved to *nolle pros* it. The Commonwealth proffered that it had made various efforts to locate Morgan and secure her attendance, without success. Hammer objected, asking that the court instead dismiss the abduction charge "outright." The trial judge orally granted the Commonwealth's motion, finding that the Commonwealth had made every reasonable effort to secure Morgan's testimony.

But Morgan arrived a few minutes afterwards, thirty-five minutes late to court. With Morgan now present, the Commonwealth asked for leave to withdraw the oral *nolle pros* or to set the abduction charge separately for trial.

The court declined to reschedule trial on the abduction charge and allowed the prosecution instead to withdraw the *nolle pros* request. After the judge asked, "Anything else?[,]" Hammer said nothing. Nor did he object after a brief recess, before the jury was brought in. The court's oral *nolle pros* rulings were never memorialized and are not mentioned in the conviction order.

Officer Mawyer testified at trial to the events recounted above. The prosecution then called Morgan to the stand. But she claimed to have a poor memory and to not recall what had happened. When asked to read the contents of her written statement, given at 3:15 a.m. the morning of the incident, she refused to read it aloud. The prosecutor proffered that Morgan had been "threatened by associates of Mr. Hammer that if she testifies against him today, she will be killed." Morgan was evasive when responding to questions about that, repeating "I don't want to be here." She ultimately denied that her husband had threatened to kill her for testifying and

- 5 -

further denied that Hammer had told her what to say. The prosecution called a victim-witness assistant, however, who testified that Morgan admitted, shortly before being called to the stand, that she feared Hammer because he had been "writing letters to people, threatening . . . to kill her."

Morgan's original, contemporaneous statement was admitted into evidence as her prior-recorded recollection. Morgan wrote that she had gotten into the car that evening to go with Hammer to the store and that he "kept driving when [she] told him to stop." She told Hammer she "wanted to get out of the car, but he kept speeding and wouldn't let [her] out." Once the police started following them, Hammer told Morgan "to hold on[,] we're going for a ride." She "told him to stop and pull over but he refused." Hammer "kept speeding until we wrecked the car in a ditch and the car ran out of gas." The Commonwealth also introduced multiple letters from Hammer to Morgan, and transcripts of messages that he sent her from jail, telling her what to say at trial to exonerate him.

Hammer did not move to strike the Commonwealth's evidence. In his defense, Hammer called Morgan back to the witness stand. Morgan denied telling the victim-witness assistant that she feared Hammer or that he had threatened her life if she testified. Morgan claimed that her written statement to the police was a lie, though she couldn't explain why she lied. She claimed that "Tamil," whose last name she didn't remember, was the one who had eluded police, not Hammer, and that Tamil had threatened to kill her. Hammer himself also testified, claiming that he was not the person driving the car and that his wife had lied about him to police. On cross-examination, he admitted to having been convicted of "nine or ten" felonies.

The jury found Hammer guilty of all three charges, recommending a prison sentence of two years on the abduction charge, five years for eluding, and five years for driving after being declared a habitual offender. The court denied Hammer's motion to set aside the verdict,

- 6 -

adjudicated him guilty, and sentenced him in accordance with the jury's verdict. Based on the Waynesboro convictions, the Circuit Court of Rockingham County found Hammer in violation of the terms of his supervised probation and imposed the balance of the suspended sentence remaining on his convictions in that court.

Counsel for Hammer noted an appeal in both cases. Unlike at trial in the Waynesboro case, where Hammer represented himself, Hammer has been represented by appointed counsel at all times in this Court.

## II. ANALYSIS

### A. Hammer waived his challenge to the trial court's *nolle pros* ruling.

"A concept dating from the late 1600s, *nolle prosequi* means 'unwilling to prosecute' in Latin." *Duggins v. Commonwealth*, 59 Va. App. 785, 790 (2012). "The term is sometimes "used as a verb" in the United States but "shorter forms" like *nolle pros* and *nol-pros* are "more common." Bryan A. Garner, *Garner's Dictionary of Legal Usage* 606 (3d ed. 2011).

At oral argument on this appeal, Hammer's counsel conceded that the trial court properly allowed the prosecution to *nolle pros* the abduction charge. Hammer instead argues that the trial court erred in permitting the Commonwealth to withdraw the *nolle pros* and proceed on the abduction charge after Morgan appeared in the courtroom. Hammer does not claim that he suffered any prejudice from that ruling—only that the ruling was "void ab initio."

But Hammer procedurally defaulted that argument because he failed to raise it at trial. Rule 5A:18 provides that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." This contemporaneous-objection requirement affords "the trial court a fair opportunity to resolve the issue at trial, thereby preventing unnecessary appeals and retrials." *Creamer v. Commonwealth*,

64 Va. App. 185, 195 (2015).  Accordingly, the procedural-default rule "applies equally to both *pro se* litigants and those who are represented by counsel." *Newsome v. Newsome*, 18 Va. App. 22, 24-25 (1994).  A "defendant who represents himself is no less bound by the rules of procedure and substantive law than a defendant represented by counsel." *Townes v. Commonwealth*, 234 Va. 307, 319 (1987) (quoting *Church v. Commonwealth*, 230 Va. 208, 213 (1985)).

Hammer's procedural default is not excused by the "good cause" or "ends of justice" exceptions in Rule 5A:18.  Hammer's opening brief does not address them.  Those exceptions cannot be raised for the first time "at oral argument." *Stokes v. Commonwealth*, 61 Va. App. 388, 397 (2013).  And "we will not sua sponte raise them on his behalf." *Jones v. Commonwealth*, 293 Va. 29, 39 n.5 (2017).

Hammer's counsel offers two other theories to excuse the procedural default, but neither persuades us.  First, he claims that the trial court denied Hammer the opportunity to object at trial to reinstating the abduction charge. *See* Code § 8.01-384(A) ("[I]f a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection shall not thereafter prejudice him on motion for a new trial or on appeal.").[2]  The trial transcript does not support his argument.  Hammer, who did not hesitate to object on *other* matters, said nothing when the trial judge, after allowing the prosecution to withdraw the *nolle pros*, asked "Anything else?"  Nor did Hammer voice an objection after the break and before the jury was brought into the courtroom.  Hammer also omitted the argument from both his six-page motion to set aside the

---

[2] *But see Jacks v. Commonwealth*, 73 Va. App. 473, 479 & nn.2-3 (finding argument waived on appeal where appellant's opening brief failed to argue that the lack of a contemporaneous objection in the trial court was excused under Code § 8.01-384(A)), *reh'g en banc granted*, 73 Va. App. 499 (2021).

verdict and his twenty-two-page motion for leave to amend that motion. So we fail to see how Hammer was denied an opportunity to make this argument below.

Second, Hammer argues that, once the trial court orally permitted the *nolle pros*, it lost jurisdiction to reinstate the abduction charge until another indictment issued. He premises this claim on *Miller v. Commonwealth*, 217 Va. 929 (1977), where the Court said that "[f]or the prosecution to proceed" after a *nolle pros* has been "entered," a "new indictment is required." *Id.* at 935. If a new indictment was required on the abduction charge, Hammer reasons, the trial judge lacked jurisdiction to reinstate it himself, thus excusing Hammer's procedural default. After all, "a challenge asserting a circuit court lacked subject matter jurisdiction may be raised for the first time on appeal." *Riddick v. Commonwealth*, 72 Va. App. 132, 142 (2020). "Deeming an order void *ab initio* effectively sidelines procedural default principles, including Rule 5A:18's requirement that arguments on appeal . . . first be presented and ruled upon by the trial court." *Winslow v. Commonwealth*, 62 Va. App. 539, 544 (2013).

But the trial court's oral allowance of the *nolle pros* did not oust it of jurisdiction to change its mind only minutes later. "In Virginia, a *nolle prosequi* is regulated by statute . . . ." *Moore v. Commonwealth*, 59 Va. App. 795, 807 (2012). Under the statute, a *nolle pros* may be "entered" in the trial court's discretion. Code § 19.2-265.3. The term *entered* connotes a written order. Rule 1:1(a) provides that the "date of *entry* of any final judgment, order, or decree is the date it is *signed by the judge* either on paper or by electronic means." (Emphasis added.) "[T]he critical event is the circuit court's entry of a written order and not any pronouncements the circuit court may make from the bench." *Bailey v. Commonwealth*, 73 Va. App. 250, 261-62 (2021).

Even if the trial judge had entered a written *nolle pros* order, the order could have been "modified, vacated, or suspended for [21] days after the date of entry." Rule 1:1(a). As we said in *Duggins*, a *nolle pros* order "cannot be revisited" once the order "becomes final *and incapable*

*of reconsideration under Rule 1:1.*" 59 Va. App at 793 (emphasis added). The *nolle pros* ruling

below did not become "incapable of reconsideration." Hammer cites no authority that a written

order entering a *nolle prosequi*, let alone an *oral* pronouncement, becomes irrevocable the

moment the trial judge incants the Latin phrase. So Hammer's jurisdictional argument falls

short.[3]

>B. Officer Mawyer' s testimony identifying Hammer as the perpetrator was not inherently incredible.

The third assignment of error claims that Officer Mawyer's testimony identifying

Hammer as the perpetrator was "inherently incredible" and that the trial judge erred by declining

to set aside the verdict on all three charges. We disagree.

Ordinarily, issues of witness credibility and the weight afforded a witness' testimony "are

matters solely for the fact finder[,] who has the opportunity to see and hear that evidence as it is

presented." *Gerald v. Commonwealth*, 295 Va. 469, 486 (2018) (quoting *Elliott v.*

---

[3] Neither Hammer nor the Commonwealth addressed—if the *nolle pros* had been irrevocable and a new indictment required—whether Hammer's failure to object to the lack of a new indictment also waived his objection. "The Virginia Constitution and the Due Process Clause of the United States Constitution requires that an accused be given clear notification of the offense with which he is charged." Ronald J. Bacigal & Corinna Barrett Lain, *Virginia Practice Series: Criminal Procedure* § 13:1 (2021-2022 ed.). The Virginia Constitution provides that "in criminal prosecutions a man hath a right to *demand* the cause and nature of his accusation." Va. Const. art. I, § 8 (emphasis added). But that provision does not mandate an indictment as the mode of presenting the accusation, and the right to "demand" an indictment can be waived. *See, e.g.*, *Rawls v. Commonwealth*, 272 Va. 334, 344 (2006) ("The requirement that the defendant be indicted is 'not jurisdictional and constitutionally imposed but is only statutory and procedural.'" (quoting *Triplett v. Commonwealth*, 212 Va. 649, 650 (1972))); *Forester v. Commonwealth*, 210 Va. 764, 766 (1970) ("[A] defendant may legally waive an indictment and be tried for a felony without any indictment at all."). The "statute of jeofails," *Forester*, 210 Va. at 766, provides that a judgment in a criminal case will not be set aside "upon any exception or objection made after a verdict to the indictment or other accusation, unless it be so defective as to be in violation of the Constitution," Code § 19.2-227. Hammer does not claim that his prosecution on the abduction charge deprived him of fair notice or violated any constitutional right. Our answer to the *nolle pros* question, however, makes it unnecessary to decide this alternative ground for waiver.

*Commonwealth*, 277 Va. 457, 462 (2009)). An appellate court "must accept 'the trial court's determination of the credibility of witness testimony unless, "as a matter of law, the testimony is inherently incredible.""" *Lambert v. Commonwealth*, 70 Va. App. 740, 759 (2019) (quoting *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006)). Witness testimony will not be found inherently incredible "unless it is 'so manifestly false that reasonable men ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Gerald*, 295 Va. at 487 (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)). We will not disturb a trial court's finding that a witness was not inherently incredible unless that determination is "plainly wrong or without evidence to support it." *Elliott*, 277 Va. at 463.

Hammer cannot meet that standard here. He argues that Officer Mawyer could not have identified Hammer as the driver that night because the car was "speeding" past Mawyer's parked cruiser. But Mawyer explained that he positioned his patrol car to get a clear view of a passing vehicle; the road was illuminated by two streetlights; he was personally familiar with Hammer and Morgan; he recognized both as they looked out the window towards him; he made direct eye contact with Hammer; and he saw the distinctive tattoo on Hammer's hand as Hammer held the steering wheel.

Mawyer's testimony was corroborated by other evidence: Morgan's written statement identifying Hammer as abducting her and eluding police; and the photograph received into evidence showing the well-illuminated location on Route 340 where Mawyer waited to intercept them. Not only that, Mawyer had a view of Hammer for about ten seconds as Hammer, wearing a black leather jacket, bolted into the woods after his car ran out of gas. That black leather jacket was found, along with Hammer, in the couple's apartment later that morning. Also found in the

apartment was the key to the car stolen from Fishersville, "fairly close" to where Hammer had fled on foot just hours before.

To be sure, Morgan offered testimony at trial inconsistent with her contemporaneous written statement to Mawyer. But the prosecution also offered testimony that Morgan feared Hammer, that he threatened her if she testified against him, and that he scripted what he wanted her to say on the witness stand. The jury received the standard instruction that, after considering all the evidence, it was free to "accept or discard all or part of the testimony of a witness" as the jury thought proper. *See Jones v. Commonwealth*, 71 Va. App. 70, 92 (2019) (discussing Va. Model Jury Instr. No. 2.020). So the jury could reasonably accept as true Morgan's contemporaneous written statement to Mawyer and reject her trial testimony, given the evidence that Hammer had coerced her. The jury was also free to disbelieve Hammer, who by his own admission was a convicted felon "nine or ten" times over.

In short, the trial court did not err in refusing to find Mawyer inherently incredible and declining to set aside the jury verdict. Nothing compelled the trial court to find Mawyer's testimony "so manifestly false" that it could not be believed, nor was his testimony "shown to be false" by evidence on which reasonable persons could not differ. *Gerald*, 295 Va. at 487.

### C. The probation revocation was proper.

Because we affirm the Waynesboro convictions, we must affirm the Rockingham court's decision finding Hammer in violation of the terms of his supervised probation. The Commonwealth and Hammer agree that the first finding compels the second.

### D. Hammer's *pro se* motions are denied.

Although represented by appellate counsel here, Hammer has filed multiple *pro se* motions having little if anything to do with the granted assignments of error. At oral argument,

- 12 -

Hammer's counsel advised that he was aware of Hammer's filings and that he incorporated into his argument whatever points counsel thought meritorious.

We appreciate counsel's candor.

We recognize that a good lawyer "need not advance *every* argument, regardless of merit, urged by the appellant . . . and must play the role of an active advocate." *Fitzgerald v. Bass*, 6 Va. App. 38, 56 (1988) (quoting *Evitts v. Lucey*, 469 U.S. 387, 394 (1985)). "Effective appellate counsel should not raise every nonfrivolous argument on appeal, but rather only those arguments most likely to succeed." *Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017). "While 'the accused has the ultimate authority' to decide whether to 'take an appeal,' the choice of what specific arguments to make within that appeal belongs to appellate counsel." *Garza v. Idaho*, 139 S. Ct. 738, 746 (2019) (quoting *Jones v. Barnes*, 463 U.S. 745, 751 (1987)). No constitutional duty requires defense counsel "to raise every nonfrivolous issue requested by the defendant." *Townes*, 234 Va. at 321 (quoting *Barnes*, 463 U.S. at 751). "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal . . . ." *Barnes*, 463 U.S. at 751.

At the same time, a court need not permit "'hybrid' representation." *Muhammad v. Commonwealth*, 269 Va. 451, 503 (2005). And Hammer identifies no rule of court that would enable a party who is represented by counsel to file *pro se* pleadings separately from those found worthy by his lawyer. *See* Rule 1:5; Code § 8.01-271.1(A).

Because Hammer is represented by appellate counsel here, his *pro se* motions are denied.

### III. CONCLUSION

We affirm both judgments.

*Record No. 0819-20-3, Affirmed.*
*Record No. 1033-20-3, Affirmed.*