## Richmond

OSCAR M. MCCARY

V.

COMMONWEALTH OF VIRGINIA

Record No. 831434.

October 12, 1984.

Present: All the Justices.

220

*John D. Sims (Cottingham and Sims,* on brief), for appellant.
*Robert H. Anderson, III, Assistant Attorney General (Gerald
L. Baliles, Attorney General,* on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

A jury found Oscar M. McCary guilty of robbery, two counts of malicious wounding, and use of a firearm in the commission of a felony. The trial court, entering judgment on the jury verdict, sentenced him to serve in the penitentiary for these offenses 20 years, 20 years, 20 years, and 1 year, respectively. On appeal, McCary challenges the rulings of the trial court on the admissibility of certain evidence. He contends that the court erred in admitting evidence seized in a warrantless search, evidence seized pursuant to an allegedly defective search warrant, and identification testimony of the two victims of the crimes.

On September 2, 1981, Sherry Hypes and Gwendolyn Emory were the two employees working at the Middle Peninsula-Northern Neck Savings and Loan branch in Gloucester Point. After reporting for work about 9:45 a.m., Hypes walked across the street to deposit the contents of the night depository box. On her way back to the Savings and Loan, Hypes spoke to a man whom she subsequently found to be McCary. About 10:30, McCary entered the branch and asked if Hypes or Emory had seen his brother; upon being informed that neither had seen a man of the description given, McCary departed. Reentering the Savings and Loan five or ten minutes later, McCary left with Emory a note to be delivered to his brother who, McCary said, was coming to the branch to obtain a loan. Throughout his two visits, McCary was the only person, other than the two employees, in the branch. Neither Hypes nor Emory knew McCary; he never told them his name or that of his brother.

When Hypes returned from lunch about 1:45 p.m., she noticed that an old gray four-door automobile, with radio antenna on the rear, passenger's side, was parked in front of the branch. About 2:20 she observed that the car was still there. As Hypes and Emory discussed the problem caused by the car blocking the entrance to the drive-in window, they saw McCary walking to the vehicle; they then saw the trunk of the car raised. Emory, who had watched McCary drive away in the same automobile after his second visit of the morning, glanced at the license plate. Hypes saw Howard Davis walk by and wave at McCary. Davis confirmed that he had exchanged greetings with McCary outside the post office, located next to the Savings and Loan; Davis said he had known McCary for at least 10 years.

About five minutes later, when there were no customers present, McCary again entered the Savings and Loan. Brandishing what appeared to be a shotgun, McCary announced that this was a "hold-up". He forced Emory to lie on the floor and Hypes to hand him the available currency. McCary then pulled a "billy-bat" from his back pocket, struck each woman in the head, knocking Emory unconscious and stunning Hypes, and went out the door. Hypes heard the car leave the drive-in window.

Lieutenant David Hudgins, of the Gloucester County Sheriff's Department, to whom the robbery was reported at 2:57 p.m., arrived at the branch about 3:08 p.m. to investigate. Emory recited to him two license plate numbers, differing in only one digit, ei-

ther one or the other of which she believed was on the car she had observed outside the drive-in window. Hudgins ascertained from the Division of Motor Vehicles that one of the numbers had been assigned to a 1967 Oldsmobile sedan registered in McCary's name.

About 4:00 p.m., State Trooper P. K. Hargis, who had received a radio report of the robbery and a description of the suspect and his automobile, discovered the car parked on the side of a hard-surfaced road in the vicinity of a trailer park in York County. Hargis put out flares, secured the area, and "kept people away until the investigators arrived." Shortly thereafter, Special Agent John C. Wagner, of the Federal Bureau of Investigation, and others came to investigate. According to Hargis, the car was locked; someone used a coat hanger to open the doors.

Wagner testified that the doors were open when he arrived. He removed two notes found inside the car and subsequently delivered them to Lieutenant Hudgins. Analysis of the notes revealed that they came from the same sheet of paper as the note left by McCary that morning at the Savings and Loan. One note removed from the car read: "This is a robbery. I want all the money now." The other read: "I will be back to get." All three notes were introduced in evidence.

Hudgins, after completing his investigation at the Savings and Loan, proceeded to the site where the car was parked, 2.9 miles from the scene of the crimes, arriving about 7:00 p.m. He was advised that a search warrant was being obtained. Although Hudgins announced that he was at that time seizing the car, he waited until the search warrant was produced before searching the vehicle. In the ensuing search, a rifle and a shotgun were found in the trunk. A fingerprint of McCary's was found on the shotgun and the shotgun was admitted in evidence at trial over McCary's objection.

The search warrant was issued by a magistrate on the basis of an affidavit made by a law enforcement officer stating that he had personal knowledge of the facts set forth therein. At the suppression hearing, the officer testified that he had no personal knowledge of the facts but set forth in the affidavit information given to him by other law enforcement officers. He further testified, over McCary's objection, that he had so informed the magistrate when he applied for the search warrant.

Hudgins showed a photographic array, including a picture of McCary, to Emory and Hypes shortly after the crimes were committed. Neither could identify McCary but both expressed confidence that they could identify the robber in person. Both victims testified that they learned the name of their assailant from others, Hypes from a member of the Sheriff's Department, Emory from someone whose identity she could not recall. Both positively identified McCary at the preliminary hearing and again at trial.

In the trial court, McCary made a motion to strike the Commonwealth's evidence based upon the allegedly tainted identification made by the two victims. He also filed a motion to suppress the Commonwealth's evidence seized in the allegedly invalid warrantless search of the automobile and the Commonwealth's evidence seized pursuant to the allegedly invalid search warrant. After hearing evidence, the trial court denied both motions.

1. Evidence seized in the warrantless search.

The warrantless search produced the two notes which, over McCary's objection, were introduced in evidence against him. McCary argues that this evidence was not admissible under any exception to the requirement that searches be conducted only pursuant to warrants issued by detached and neutral magistrates. We disagree.

At the pre-trial suppression hearing, Trooper Hargis testified unequivocally that when he found McCary's car all the doors and windows were locked. He thought that one of the agents of the Federal Bureau of Investigation opened the door and removed a piece of clothing from the front seat and a piece of paper from the glove compartment. The clothing, which Hargis could see before the car was opened, was used to give tracking dogs a scent to follow. The car appeared to Hargis to have been abandoned.

The officers established that the suspect had crossed the front yard of a nearby residence. Hargis, who had information that the robber had a gun and that he had inflicted personal injuries, considered the possibility that the car may have contained weapons.

Special Agent Wagner was vague in his testimony about his part in the warrantless search. The car appeared to him to have been abandoned when he entered the vehicle. He was concerned that the suspect, who was reported to be armed, might use the weapon. He also entered the car to determine who committed the

crimes. Wagner said that the car keys were found under the mat inside the car. He did not learn until the next day that the car had run out of gasoline.

If, as the Commonwealth argues, McCary's car had been abandoned before the warrantless search was conducted, then McCary may not successfully invoke the guarantees of the Fourth Amendment. *Hawley* v. *Commonwealth*, 206 Va. 479, 482, 144 S.E.2d 314, 316 (1965), *cert. denied*, 383 U.S. 910 (1966); *see Katz* v. *United States*, 389 U.S. 347 (1967); *Parks* v. *Commonwealth*, 221 Va. 492, 270 S.E.2d 755 (1980), *cert. denied*, 450 U.S. 1029 (1981). We need not determine whether the car was abandoned, however, because of our conclusion that the search was justified because of the existence of probable cause and exigent circumstances.

Searches conducted without prior judicial approval are *per se* unreasonable under the Fourth Amendment, subject to exceptions allowed when exigencies require warrantless searches. *Chambers* v. *Maroney*, 399 U.S. 42, 51 (1970); *Fore* v. *Commonwealth*, 220 Va. 1007, 1010, 265 S.E.2d 729, 731, *cert. denied*, 449 U.S. 1017 (1980); *Thims* v. *Commonwealth*, 218 Va. 85, 88-89, 235 S.E.2d 443, 445 (1977). Under the well-established automobile exception to the warrant requirement, an automobile may be searched without a warrant where there are both probable cause to believe the car contains evidence of crime and exigent circumstances.* *Chambers*, 399 U.S. at 51; *Fore*, 220 Va. at 1010-11, 265 S.E.2d at 731-32.

In the present case, the facts support a finding of probable cause sufficient to allow the initial search of McCary's automobile. The car matched the description given by two witnesses of the car parked at the Savings and Loan the day of the robbery. It bore one of two possible license numbers recited by Emory. Both Emory and Hypes told investigators immediately after the incident that the man who robbed them was the same man they had seen earlier in the branch and parking lot. Each had earlier ob-

---

* An argument is sometimes made that the United States Supreme Court no longer requires exigent circumstances to justify a warrantless automobile search but instead requires only a showing of probable cause under *Michigan* v. *Thomas*, 458 U.S. 259 (1982), and *Texas* v. *White*, 423 U.S. 67, 68 (1975). *See United States* v. *Farnkoff*, 535 F.2d 661, 665 n.12 (1st Cir. 1976); *United States* v. *Robinson*, 533 F.2d 578, 586 (D.C. Cir.) (Robb, concurring), *cert. denied*, 424 U.S. 956 (1976). We need not decide that issue in the present case in view of our holding that there were exigent circumstances. *Infra*, pp. 10-11.

served the robber in or near the car described. Furthermore, Hypes reported she heard a car leave the drive-in window immediately after the robber left the branch. Given the accounts of the two witnesses, the officers reasonably believed the culprit had fled the scene in the car described. On finding a car exactly matching the description and bearing one of the two possible license numbers, the officers clearly had probable cause to believe the vehicle was the robber's getaway car and that it contained fruits of the crimes, weapons, or evidence as to the identity and whereabouts of the robber.

An automobile's mobility and the likelihood that evidence will be lost or destroyed if the automobile is permitted to continue on its way present exigent circumstances justifying an exception to the warrant requirement. *Carroll* v. *United States*, 267 U.S. 132, 153 (1925). Courts have been troubled by the application of the exception to searches of automobiles that have been secured by the police or immobilized. *See Cardwell* v. *Lewis*, 417 U.S. 583, 594 (1974) (plurality upheld the warrantless seizure of an unattended car parked in a public lot and the subsequent examination of the car's exterior); *Coolidge* v. *New Hampshire*, 403 U.S. 443, 461-63 (1971) (plurality excluded evidence seized from an unoccupied car parked in a private driveway). Where police have secured or seized an automobile to be searched, however, risk of removal of the car or its contents may still exist and justify an immediate warrantless search. *See Chambers,* 399 U.S. at 52; *Fore*, 220 Va. at 1012, 265 S.E.2d at 733; *Patty* v. *Commonwealth*, 218 Va. 150, 156-57, 235 S.E.2d 437, 441 (1977), *cert. denied*, 434 U.S. 1010 (1978).

Moreover, exigent circumstances may exist even if there is no risk of removal of the vehicle or its contents. Various courts have held that an independent exigency justifies the warrantless search of an unoccupied vehicle when there is an immediate need to continue a promising criminal investigation. *See United States* v. *McBee,* 659 F.2d 1302, 1305 (5th Cir. 1981), *cert. denied*, 456 U.S. 949 (1982); *United States* v. *Robinson*, 533 F.2d 578, 584 (D.C. Cir.), *cert. denied,* 424 U.S. 956 (1976); *United States* v. *Shye*, 473 F.2d 1061, 1065 (6th Cir. 1973); *Gray* v. *State*, 596 P.2d 1154, 1156-57 (Alaska 1979); *State* v. *Kolinsky*, 438 A.2d 762, 766 (Conn. 1980); *Shreeves* v. *United States*, 395 A.2d 774, 785-86 (D.C. 1978), *cert. denied,* 441 U.S. 943 (1979); *Barnes* v. *Florida*, 406 So.2d 84, 85 (Fla. Dist. Ct. App. 1981); *Gaddis* v.

*State,* 267 Ind. 100, 105-06, 368 N.E.2d 244, 246 (1977); *Barrow* v. *State,* 474 A.2d 967, 973 (Md. App. 1984). This exigency is said to be "within the spirit, though not the text, of the 'hot pursuit' exception." *Robinson,* 533 F.2d at 583.

Courts applying the "automobile exception" to an immobilized getaway car have required a showing of urgent need and peaceable entry. Urgent need may be demonstrated by such factors as these: commission of a grave offense, a search conducted soon after the offense, a clear showing of probable cause, a reasonable belief that the suspect is armed, the suspect not having been apprehended or identified, and the likelihood of his escape absent immediate action. *Robinson,* 533 F.2d at 583; *Shye,* 473 F.2d at 1065. These factors, together with the diminished expectation of privacy an individual has in his automobile, *see South Dakota* v. *Opperman,* 428 U.S. 364, 367 (1976), justify an immediate warrantless search of the vehicle to obtain clues as to the identity and location of the suspect. *Robinson,* 533 F.2d at 584.

We agree that the need to pursue and apprehend a person suspected of having committed a grave offense and of being armed and dangerous and the need to obtain information as to his identity and location constitute exigent circumstances. In the present case, the police had probable cause to believe that McCary's automobile was the robber's getaway car. Discovery of the car approximately one hour after the crimes were committed gave immediate impetus to the investigation.

The police knew that the suspect had committed more than one grave offense and that he had carried a gun during commission of the crimes. They had ascertained that McCary was the owner of the car but they did not know whether he or someone else was the criminal agent. The suspect, whom the officers reasonably believed was still armed and constituted danger to the public, had not been apprehended, and his escape was likely if they failed to act promptly. (Indeed, McCary eluded his pursuers in spite of their immediate search of the car; six weeks later, Hudgins received a report that he was in custody in Kansas). The officers reasonably believed that a search of the car might disclose weapons and clues to the identity of the suspect, his probable location or escape route, and evidence of the crimes. They made a peaceable entry and search of the automobile. We hold that there were exigent circumstances in addition to probable cause justifying the warrantless search.

■ McCary has also argued that the chain of custody of the notes found in the car was not established with reasonable certainty, but this argument is not persuasive. Although the testimony of Wagner was imprecise, the record shows clearly that he removed the papers from the car and handed them to Hudgins, and that they were initialed by Wagner and Hudgins and placed in plastic containers to be preserved for use at trial. This evidence is sufficient. The chain of custody after delivery to Hudgins is not challenged.

2. Evidence seized in the search pursuant to the search warrant.

Following the warrantless search of McCary's automobile, the police obtained a search warrant authorizing further search of the vehicle. McCary contends the warrant was fatally defective and the shotgun found during this search was improperly admitted in evidence.

Officer J. C. Blount, of the York County Sheriff's Department, executed the affidavit supporting the search warrant. At the suppression hearing, Blount testified that he had erred in checking the box on the affidavit form indicating that he had personal knowledge of the facts set forth therein. He acknowledged that he had no personal knowledge of the facts but had received the information from other police officers. He testified, however, that he had so informed the magistrate who issued the warrant.

The affidavit stated that a witness placed McCary in the vicinity of the Savings and Loan for several hours and reported that he was driving a gray Oldsmobile. The affidavit further stated that such a car, registered in McCary's name, had been found abandoned at a specified location in York County.

■ The Fourth Amendment requires only that the magistrate have a "substantial basis" for concluding the search will uncover evidence of wrongdoing. *Illinois* v. *Gates*, 462 U.S. 213 (1983) (replacing the "two-pronged test" of *Aguilar* v. *Texas*, 378 U.S. 108 (1964), and *Spinelli* v. *United States*, 393 U.S. 410 (1969), with a "totality of the circumstances" test for determining probable cause). Since the affidavit of Officer Blount contained allegations of facts known to victims, eyewitnesses, and investigating officers, the information contained therein supplied probable cause for issuance of the search warrant.

■■■■■ The main thrust of McCary's attack on the warrant, however, is Blount's admittedly incorrect statement that he had personal knowledge of the facts contained in the affidavit. We conclude that the error did not invalidate the warrant or the search and seizure conducted thereunder.

The Fourth Amendment requires that the magistrate receive sufficient information, under oath or affirmation, to support a finding of probable cause. *Gates*, 462 U.S. at 236. There is no requirement under the Fourth Amendment that the sworn statement be reduced to writing. *United States ex rel. Gaugler* v. *Brierley*, 477 F.2d 516, 522 (3d Cir. 1973). Thus, an insufficient affidavit may be supplemented or rehabilitated by information disclosed to the issuing magistrate upon application for the search warrant. *Id.; Leeper* v. *United States*, 446 F.2d 281, 286 (10th Cir. 1971), *cert. denied*, 404 U.S. 1021 (1972); *see Whiteley* v. *Warden*, 401 U.S. 560, 565 n.8 (1971); *Aguilar* v. *Texas*, 378 U.S. 108, 109 n.1 (1964).

■■■■■ McCary contends, however, that Virginia Code § 19.2-54 requires that any statement in support of a warrant be preserved verbatim. Therefore, he says, since Blount's explanatory statement to the magistrate was not preserved verbatim, it was inadmissible in evidence. We disagree.

Code § 19.2-54 states what shall be included in the affidavit and defines "affidavit" as "statements made under oath or affirmation and preserved verbatim." We agree that the affidavit must include any supplementary facts presented to the magistrate to establish probable cause. But here no such additional facts were supplied. A statement of the source of the affiant's information, while required by the Fourth Amendment, is not mandated by Code § 19.2-54. It was proper to admit Blount's testimony, given to rebut the charge that the warrant was based on a false affidavit, that he had given the magistrate the correct source of his information. It was also proper for the magistrate to consider Blount's explanation together with the written affidavit. The affidavit form did not contain a statement to be checked by the affiant when his information was obtained from other police officers. Blount's explanation did not expand or supplement the facts supporting probable cause for issuance of a warrant. His testimony shows that he supplied accurate information on which the magistrate properly relied in issuing the warrant.

■ We hold the search was valid for another reason. We embrace the recently announced "good faith" exception to the exclusionary rule. *See United States* v. *Leon,* 104 S.Ct. 3430 (1984); *Massachusetts* v. *Sheppard,* 104 S.Ct. 3424 (1984). In *Sheppard,* an officer submitted a warrant form which dealt with controlled substances, although his affidavit sought authorization to search for evidence of murder. The officer informed the judge of the inaccuracy in the form but the judge issued the warrant without correcting the error or incorporating the affidavit in the warrant. The Supreme Court held that the officer reasonably concluded the warrant authorized a search for the items listed in the affidavit. The Court refused to rule that the officer was required to disbelieve the judge who had advised him that he could conduct the requested search. *Id.* at 3429.

In the present case, when the officers conducted the second search, they acted reasonably under the authority of an apparently valid warrant. Accordingly, regardless of the actual validity of the warrant, the fruits of the search were admissible in evidence.

3. Identification testimony of the victims.

■ McCary says that the trial court erred in permitting Hypes and Emory to testify as to his identity. McCary relies upon the inability of the victims to identify him from a photographic array and their acknowledgement that they were told by others that their assailant was McCary.

Hypes and Emory received hospital treatment for their wounds. The photographic array was exhibited to them before they left the hospital several hours after the crimes were committed. The photograph of McCary was eight or ten years old. Hypes told the police that one photograph looked like the robber; she believed she could identify him from the array but she preferred not to base her identification on an old picture. She gave the police a description of the robber based upon her personal observation and expressed confidence that she could identify him in person. The next day, Emory also told the police that she believed she could identify the robber if he were placed before her.

Hypes cut out a picture of McCary published in a local newspaper with an account of the crimes committed at the Savings and Loan. She conceded that a member of the Sheriff's Department

informed her that McCary was the robber. Emory could not remember who gave her the same information. Both victims, however, made positive, unequivocal identifications of McCary at his preliminary hearing, some 15 months after the crimes, and again at his trial. Both victims testified that they identified him as the man, whatever his name might be, who committed the crimes.

In *Neil* v. *Biggers*, 409 U.S. 188, 199-200 (1972), the Supreme Court stated that in determining whether under the "totality of the circumstances" identification is reliable the following criteria should be applied:

> As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Hypes and Emory had the opportunity to view McCary not only at the time of the crimes but at other times earlier in the day. Hypes noticed him as she walked past him in the street shortly after reporting for work. Both Hypes and Emory observed him on two occasions that he entered the Savings and Loan to inquire about his brother. Both saw him walking outside the building before he entered for the third time. On each of his three visits, no one but McCary and the two employees was in the branch; when the women looked at McCary, his face was not covered.

The degree of the victims' attention is shown by their curiosity concerning McCary's actions before the crimes. Emory was sufficiently disturbed about his blocking the drive-in window to suggest calling the police to have his car removed. She also committed to memory his license number, a feat that subsequently facilitated the investigation of the crimes.

Both victims gave a description of the criminal, including details of his clothing and shoes. According to Lieutenant Hudgins, the description of the man "matched" McCary. Moreover, Davis, who knew McCary, saw him next to the Savings and Loan about five minutes before the crimes were committed.

The level of certainty demonstrated by both witnesses was high.

Neither manifested the slightest doubt that McCary was the criminal who had perpetrated the offenses.

Although 15 months elapsed between the crimes and the identification testimony given by the victims at McCary's preliminary hearing, the mere passage of time is insufficient to invalidate the identification. Considering the "totality of the circumstances," we hold that the identification testimony was not tainted by the police when they supplied McCary's name as that of the man whom the victims had described. We further hold that the inability of the victims to identify McCary from the photographic array, while a factor to be weighed by the jury in considering the evidence, did not render the identification testimony inadmissible.

We conclude that the in-court identifications had independent sources free from taint, specifically the ample opportunities the victims availed themselves of to observe McCary in his activities before and during the crimes.

For reasons assigned, we will affirm the judgment.

*Affirmed.*