PRESENT:  All the Justices

DWAYNE LAMONT SAMPLE, JR.

                                                      OPINION BY

v.  Record No. 220445                         JUSTICE THOMAS P. MANN
                                              FEBRUARY 8, 2024

COMMONWEALTH OF VIRGINIA

FROM THE COURT OF APPEALS OF VIRGINIA

Dwayne Lamont Sample, Jr. was found guilty of attempted robbery.  Sample assigns error to the trial court's denial of his motion to suppress an out-of-court identification and the subsequent in-court identification as well as his motion to strike.  In this appeal, we consider whether the single photo showup, from which the victim identified Sample, was impermissibly suggestive, and even if it were, whether it was nonetheless constitutionally reliable under the totality of the circumstances.  We also consider whether the evidence presented was sufficient to convict Sample of attempted robbery.  For the following reasons, we agree with the trial court and affirm the judgment of the Court of Appeals.

BACKGROUND

At approximately 10:00 p.m. on September 17, 2019, a man wearing a bandana attempted to rob Mark Angiulli at gunpoint outside of a warehouse garage.  Angiulli and his son were loading granite onto a trailer when the man approached Angiulli from the left side.  While standing 15 to 20 feet away from Angiulli, the man pointed a gun back and forth between Angiulli and his son and said, "Give me your wallet.  Give me your f***ing wallet."  He then "came right up" within two to three feet of Angiulli while pointing the gun directly in his face the entire time.  Angiulli noticed the gun's small barrel and quickly realized the gun was likely a BB gun.  Angiulli yelled out to his son that it was a BB gun, and as he grabbed the gun away from the assailant, both men hit the ground.  The gun dropped and the man fled the scene.

Angiulli called 911 less than five minutes after the incident, and an officer equipped with a body-worn camera arrived on scene five to ten minutes after the 911 call. Angiulli told the officer the man was wearing a black hoodie, black jeans, black ballcap, black and white tennis shoes, and a black or dark blue bandana. Angiulli described the man as a "skinny white kid," about 20 years old or in his early twenties with big brown eyes and dark short hair. He estimated the man was about his height, 5'10", and weighed around 150 pounds. Angiulli and his son indicated to the officer the direction of the assailant's flight.

The officer then described to Angiulli several people who lived in that location, including Sample who is "mixed, so he looks almost Hispanic, cause he's not a white guy." Angiulli then responded, "this guy's face was awfully pale though, you know, he didn't look mixed to me, he looked pure white." Throughout the conversation with the officer, Angiulli repeated the same description multiple times.

The officer left the scene to search for someone matching Angiulli's description. He suspected Sample, with whom he had prior encounters, because of Sample's "very distinctive eyes," his build, and the direction of the man's escape. The officer asked dispatch to send Sample's photograph to the officer's cell phone, and he returned to the scene 15 minutes later.[1] The officer showed Angiulli a booking photo of Sample on his phone and said, "I have a picture of somebody that I was thinking about, but I don't know if—you said you just saw their eyes." After seeing the photo, Angiulli immediately said, "Yep." The officer clarified, "That's him?" and Angiulli repeated, "Yep." The officer then asked again, "But you think that's definitely him?" Angiulli replied, "Yeah—those big brown eyes, yep . . . he's light-complected like that." "Yeah, kind of like pale-ish?" the officer asked, and Angiulli replied, "Yeah. Yep." The officer

---

[1] The length of time is calculated based on the body-worn camera time stamps.

collected the gun and the magazine left behind at the scene as well as buccal swabs from Angiulli and his son. Sample was charged with attempted robbery and subsequently arrested.

Sample filed a motion to suppress all evidence of any pretrial identification and any subsequent in-court identification. Sample argued that the manner in which the officer showed Angiulli his photograph was impermissibly suggestive, rendering the identification unreliable in violation of the Fifth and Fourteenth Amendments to the Constitution.

At the suppression hearing, Angiulli testified that even though it was nighttime, and a streetlight was out of service, the warehouse LED lights sufficiently illuminated the area where the incident occurred. He testified he was "looking back and forth" between the man and the gun and repeating to himself, "Remember him. Remember the gun." Angiulli also testified that the man who attempted to rob him wore dark clothing and a dark bandana. He recalled describing the man to the officer as "Caucasian with very dark eyes and eyebrows," "lighter skinned," and of "thin build, about 150 to 170 pounds . . . wearing a black hoodie, a black hat, black skinny jeans and Van[s]-looking shoes, like white soles and black tops." Angiulli reiterated he noticed the man "had real dark, sunken eyes; real dark eyebrows with distinct marks on them . . . and almost black pupils." Angiulli declared he had no question when he saw the photograph of Sample that he was the man who attempted to rob him. Angiulli then identified Sample in court. Angiulli stated he "will never forget those eyes directly above the barrel of the weapon." Angiulli also identified the gun and the magazine as the ones Sample used that night.

On cross examination, Angiulli stated he owned several guns and during the robbery he was able to determine within a few seconds that Sample was using a BB gun. He came to this conclusion based on the opening of the barrel in comparison to the size of the gun. Angiulli clarified that the man was in front of him for five to ten seconds before Angiulli wrestled him to

3

the ground.  Angiulli asserted he had no doubt in his mind that if Sample did not look like the person who robbed him, he would speak up.

The officer then testified about the encounter.  The officer stated that after Angiulli gave him the description of the assailant and the direction in which the man ran, he thought of Sample due to previous encounters with him.  On cross examination, the officer testified he relied on the exigency of the circumstances as a justification for the single photo showup.  Based on his training, he explained that a single photo showup is permitted when the victim of a crime gives a "vivid description" of the suspect and can identify the suspect within a reasonable amount of time.

The trial court denied the motion to suppress, finding that the photographic identification was not unduly suggestive.  It observed that Angiulli "was able to focus" and within "a matter of seconds" determined that the gun pointed at him was a BB gun.  Angiulli saw "something about the assailant's eyes that were very distinctive."  When commenting on the body-worn camera footage, the trial court noted that its "understanding of the evidence is that the assailant was facing the lights and facing the garage opening."  The trial court also stressed that Angiulli immediately identified Sample upon seeing his photograph.  The case proceeded to a bench trial, and the trial court incorporated the transcript from the suppression hearing as part of the record.

At trial, the Commonwealth called two expert witnesses in addition to the incorporated evidence.  A forensic scientist specializing in DNA analysis, Dr. Thonensen, testified that Sample could not be eliminated as a contributor to the DNA mixture profile found on the receiver of the BB gun, while both Angiulli and his son were eliminated.  Dr. Greenspoon, a forensic molecular biologist specializing in DNA analysis and statistics conducted probabilistic modeling.  Dr. Greenspoon testified Sample could not be eliminated as a contributor to the DNA

4

mixture profile obtained from the gun's trigger and grip area. Dr. Greenspoon elaborated that a match between the swab of the trigger and the grip area of the BB gun and Sample is two trillion times more probable than a coincidental match to an unrelated African American person, 39 billion times more probable than a coincidental match to a Caucasian person, and 35 billion times more probable than a coincidental match to an unrelated Hispanic person.

The Commonwealth then rested, and Sample moved to strike the Commonwealth's evidence, arguing that Angiulli's identification was unreliable, and the DNA evidence could have been a result of secondary transfer. The trial court denied the motion to strike, and the renewed motion to strike after Sample presented no evidence. The trial court ultimately found Sample guilty of attempted robbery. It also found that Angiulli's description of Sample as "Caucasian" was not unreasonable considering Sample is "light-skinned" and was wearing dark clothes during the incident. Lastly, the trial court noted that Sample could not be eliminated as a contributor of the DNA mixture found on the gun and there was no evidence of secondary transfer. Sample appealed his conviction.

In a divided decision, a panel of the Court of Appeals affirmed the conviction by unpublished opinion. *Sample v. Commonwealth*, Record No. 0161-21-1, 2022 Va. App. LEXIS 265, at *17-18 (Va. Ct. App. June 28, 2022). The Court of Appeals, relying on the factors set out in *Neil v. Biggers*, 409 U.S. 188, 199 (1972), found that the factors weighed in favor of finding Angiulli's out-of-court identification reliable. *Sample*, 2022 Va. App. LEXIS 265, at *11-12. The court also found the evidence sufficient to convict Sample based on the DNA found on the gun and Angiulli's out-of-court and in-court identifications. *Id.* at *15-16. The dissent "[w]eigh[ed] the *Biggers* factors against the corrupting influence of the officer's suggestive identification procedure, [and] concluded that the officer's unduly suggestive identification

5

procedure created a substantial likelihood of irreparable misidentification." *Id.* at *23. Sample timely noted his appeal to this Court.

## ANALYSIS

### I. OUT OF COURT IDENTIFICATION

"When reviewing a denial of a motion to suppress evidence, an appellate court considers the evidence in the light most favorable to the Commonwealth and will accord the Commonwealth the benefit of all reasonable inferences fairly deducible from that evidence." *Branham v. Commonwealth*, 283 Va. 273, 279 (2012). The appellant "has the burden of showing that even when the evidence is reviewed in that light, denying the motion to suppress was reversible error." *Id.* While "[w]e give deference to the factual findings of the trial court," *Sidney v. Commonwealth*, 280 Va. 517, 522 (2010), "[w]e review de novo the trial court's application of the law to the particular facts of the case." *Branham*, 283 Va. at 279.

### A. Suggestiveness of the Photo Showup

Viewing the evidence in this light, we turn to whether the single photo showup violated Sample's due process rights. Sample contends that the trial court should have suppressed Angiulli's out-of-court identification and prohibited future in-court identifications because the single photo showup, combined with the officer's comments, was unduly suggestive and created a likelihood of misidentification. Sample argues that the officer's comment, "I have a picture of someone that I was thinking about" was suggestive in nature and led Angiulli to believe the officer knew Sample was the man who attempted to rob Angiulli. We disagree.

When analyzing the constitutionality of an out-of-court identification, we must first determine whether the procedure was impermissibly suggestive. *Biggers*, 409 U.S. at 198. "[D]ue process concerns arise only when law enforcement officers use an identification

6

procedure that is *both* suggestive and unnecessary." *Perry v. New Hampshire*, 565 U.S. 228, 238-39 (2012) (citing *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977) and *Biggers*, 409 U.S. at 198)) (emphasis added). Because Sample's argument focuses solely on the suggestiveness of the procedure, we need not address whether it was unnecessary. While single photo showups generally should be viewed with suspicion, we must consider the specific facts in the case before us to determine whether the single photo showup was unduly suggestive. *See, e.g., Drewry v. Commonwealth*, 213 Va. 186, 190 (1972). "It is not enough that the procedure 'may have in some respects fallen short of the ideal.'" *Sexton v. Beaudreaux*, __ U.S. __, __, 138 S. Ct. 2555, 2559 (2018) (quoting *Simmons v. United States*, 390 U.S. 377, 385-86 (1968)). An identification procedure becomes impermissibly suggestive only when it rises to a level of suggestiveness that undermines the identification's reliability. *Id.*

An identification procedure may be impermissibly suggestive when an officer's comments indicate law enforcement has "other evidence that one of the persons pictured committed the crime." *Id.* (internal quotation omitted); *Simmons*, 390 U.S. at 383. The procedure may also be prohibitively suggestive when it makes the identification "virtually inevitable." *See Foster v. California*, 394 U.S. 440, 443 (1969). The Supreme Court of the United States addressed "virtually inevitable" identifications in *Foster* and found an identification virtually inevitable when the defendant was the only subject to appear repeatedly in different lineups. *Id.* The Court held that this procedure equated to law enforcement effectively telling the witness, "This is the man." *Id.*

However, a comment indicating that a law enforcement officer believes the assailant is in one of the pictures does not make the identification virtually inevitable and thus impermissibly suggestive. *Drewry*, 213 Va. at 190. In *Drewry*, during a photographic lineup, the officer

expressed his belief that "the assailant was among those pictured." *Id.* Holding that the procedure was not impermissibly suggestive, this Court reasoned that the necessary and unavoidable implication of showing a witness photographs of possible assailants is that law enforcement believe the "guilty party" might be in one of them. *Id.*

Here, the officer's comment was not suggestive and was, in fact, more equivocal than the belief expressed in *Drewry* that the assailant was among those pictured. Here, the officer commented, "I have a picture of somebody that I was thinking about, but I don't know if—you said you just saw their eyes." The comment was merely an expression of what a photographic identification unavoidably implies–that the officer believed the assailant might be pictured–not that "this is the man" who did it. Unlike the practice criticized in *Simmons*, the officer in this case did not suggest to Angiulli that there was some other evidence establishing Sample as the culprit. The officer's comment acknowledged that he was unsure about his suspicion of Sample and had only provided the photograph of Sample because the officer believed Sample roughly matched the description given by Angiulli.

In sum, the officer's comments did not create circumstances which induced Angiulli to inevitably identify Sample. The officer's comments here cannot be said to be impermissibly suggestive and were "at most, harmless in [their] effect." *See Drewry*, 213 Va. at 190. We agree with the trial court that the single photo showup of Sample, including the officer's comment, "I have a picture of somebody that I was thinking about," did not run afoul of Sample's due process protections and that the out-of-court identification was constitutionally reliable.

Accordingly, due process does not require any further finding of the identification's reliability because it was not procured by impermissibly suggestive methods. *Walker v. Commonwealth*, 302 Va. __, __ (2023) (citing *Perry*, 565 U.S. at 248). Even still, while an

8

identification procedure may be arguably suggestive, it still does not inevitably result in its suppression without further consideration. *Perry*, 565 U.S. at 239. An out-of-court identification procured through an impermissibly suggestive procedure is constitutionally acceptable so long as it is reliable under the totality of the circumstances. *Biggers*, 409 U.S. at 199. "Reliability is the linchpin in determining the admissibility of [an] identification." *Manson*, 432 U.S. at 114. To determine the identification's reliability, due process requires courts to assess, on a case-by-case basis, whether the "procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons*, 390 U.S. at 384; *Biggers*, 409 U.S. at 199.

B. *Biggers* Factors[2]

The Supreme Court of the United States has identified five factors in evaluating the likelihood of misidentification: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Biggers*, 409 U.S. at 199. At oral argument and in his brief, Sample conceded factors four and five weigh in favor of finding Angiulli's identification reliable. Oral Argument Audio 02:08 to 02:19 (November 1, 2023). We find that under the totality of the circumstances, all five factors weigh in favor of the reliability determination.

---

[2] While we do not find the identification procedure used in this case was impermissibly suggestive, we still review the *Biggers* factors here to emphasize that, even had we found a constitutional problem with the process used, the identification was nonetheless constitutionally sound.

1. Opportunity of the witness to view the criminal at the time of the crime.

The record demonstrates that Angiulli had an adequate opportunity to view his assailant. Sample argues that the encounter was very brief and occurred at night with no streetlights. This Court analyzed the first factor in *Satcher v. Commonwealth*, 244 Va. 220, 248-49 (1992). There, this Court found that the victim had a sufficient opportunity to view her assailant when she saw him on a bike path 30 and 50 feet away, and then made eye contact with him while passing each other less than two feet apart at nighttime. *Id.*

Here, the man who attempted to rob Angiulli first stood 15 to 20 feet away from him and then approached Angiulli while pointing the gun in his face. Angiulli testified that he faced the man for about five to ten seconds at arm's length before he decided to wrestle him to the ground, affording himself enough opportunity to look at the man's eyes. As seen on footage from the body worn camera, the warehouse's garage door was open and interior LED lights illuminated the area of the incident. A streetlight diagonal to the warehouse was also lit. We give deference to the trial court's finding of fact that the area was well lit and bright enough for Angiulli to observe the man clearly. Thus, this factor weighs in favor of finding Angiulli's identification reliable.

2. Witness' degree of attention.

The record reflects that Angiulli paid close attention to the assailant throughout the attempted robbery. When addressing this factor, the Supreme Court in *Biggers* found that the witness was a victim of a prolonged rape where she spent a "considerable period of time" with her assailant. 409 U.S. at 200-01. The Court reasoned that she was not a "casual observer," given that her description of the assailant was "more than ordinarily thorough," and weighed this factor in favor of reliability. *Id.*

10

Here, despite the gravity of having a gun pointed at him, Angiulli paid enough attention to recognize the weapon as a BB gun and remembered the distinctive eyes of the man attempting to rob him. While under stress, Angiulli managed to repeatedly tell himself, "Remember the man. Remember the gun." He testified that he was concentrating on the man and the gun so attentively that he noticed the barrel's disproportionately small circumference relative to the size of the gun and within seconds determined that it was a BB gun. He was also able to notice the man's distinctive eyes and confidently stated that he would never forget them. Lastly, Angiulli described the man's clothing in great detail, and estimated his height, weight, and age. It is clear that Angiulli's attention to both the gun and Sample's appearance was "more than ordinarily thorough" and that he was not merely a casual observer in this situation. Thus, this factor weighs in favor of finding reliability.

### 3. Accuracy of the witness' prior description.

The record shows Angiulli provided a detailed and accurate description of Sample to the officer. This Court examined this factor in *McCary v. Commonwealth*, 228 Va. 219, 233 (1984), and found that a description consisting of clothing and shoes that matched the defendant was sufficient for this factor to weigh in favor of reliability. Sample argues that Angiulli's description was inconsistent with Sample's "physical characteristics" because Angiulli described him as Caucasian while Sample is of mixed race. We are unpersuaded.

Deference is given to the trial court's observations, and it was not unreasonable, on these facts, for Angiulli to describe Sample as Caucasian. Angiulli also estimated the man to be about 5'10" tall, 150 to 160 pounds and emphasized the man's big brown eyes, brown hair, and how pale he looked. This estimated height, weight, and age all matched Sample's features. Angiulli repeated this comprehensive description multiple times throughout his conversation with the

11

officer.  The description never changed and remained the same during the suppression hearing. We find that this factor weighs in favor of finding the identification reliable.

4.  Level of certainty demonstrated by the witness at the confrontation.

Angiulli testified he was certain the man in the photograph was the same man who attempted to rob him, and the record amply demonstrates this certainty.  *Compare Delong v. Commonwealth*, 234 Va. 357, 367 (1987) (finding identification reliable because "[t]he level of certainty [the witness] demonstrated at the time of confrontation leaves no doubt that she was utterly convinced . . . when . . . her exclamation was, 'My God, that's the car, and My God, that's him.'"), *with Curtis v. Commonwealth*, 11 Va. App. 28, 32 (1990) (finding identification not reliable because of "[t]he victim's inability to identify the appellant when first presented with his photograph" and the court's inability to verify the accuracy of the description).

When Angiulli pointed the officer in the direction the man ran, the officer described a person of mixed race living there.  Instead of subscribing to that idea, Angiulli pushed back and confidently told the officer, the man "did not look mixed" to him.  However, when the officer showed Sample's photograph to Angiulli less than an hour after the incident, Angiulli immediately said "Yep," and confirmed it was the man who tried to rob him.  Even upon questioning by the officer, Angiulli expressed no doubt when identifying Sample as his assailant. Angiulli confidently repeated three times that Sample, the person in the photograph, was the man who tried to rob him, despite how adamant he was before viewing the photograph that the man did not appear to him to be of mixed race.  Therefore, we agree with Sample's concession that this factor weighs in favor of reliability.

5. Length of time between the crime and the confrontation.

This factor is also conceded by Sample and our own review is consistent with Sample's concession. The time that elapsed between the attempted robbery and the identification was between 45 minutes to an hour. Based upon the facts of this case, the certainty of the victim's identification, and all of the other facts and circumstances described herein, the length of time between the crime and the confrontation is a nominal consideration, and, under any circumstances, weighs in favor of concluding that the identification was reliable.

Whether our analysis centers upon the likelihood of misidentification and impermissible suggestiveness or the *Biggers* factors, the result is the same: the victim's identification of Sample was constitutionally valid and not violative of his due process rights and protections.

II. SUFFICIENCY OF THE EVIDENCE

Sample also assigned error to the trial court's denial of his motion to strike based upon the sufficiency of the evidence. "When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (alteration in original) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018)). "In such cases, '[t]he Court does not ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "Rather, the relevant question is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). Additionally, in evaluating the sufficiency of the evidence, "we view the evidence in the light most favorable to the prevailing

party below, the Commonwealth, and grant it the benefit of all fairly deducible inferences." *Winston v. Commonwealth*, 268 Va. 564, 609 (2004).

Sample argues in his second assignment of error that Angiulli's identification and the DNA evidence were insufficient to find Sample guilty of attempted robbery beyond a reasonable doubt. He contends that even if the trial court properly denied his motion to suppress, it should have nonetheless found Angiulli's identification at trial not reliable beyond a reasonable doubt.

Preliminarily, we note that an identification analysis does not address the sufficiency of the evidence. Rather, that analysis focuses upon due process considerations. Certainly, if there are no due process concerns, the trier of fact may consider the evidence, but that is a very different thing than evaluating the identification within a sufficiency matrix. Motions to strike, on the other hand, "deal with the sufficiency rather than the admissibility of evidence." *Woodson v. Commonwealth*, 211 Va. 285, 288 (1970). Moving to the sufficiency of the evidence analysis, this Court gives deference to the trier of fact's finding of witnesses' credibility and "will not seek to pass upon the credibility of the witnesses where their evidence is not inherently incredible." *See Gerald v. Commonwealth*, 295 Va. 469, 486 (2018). Because Angiulli's identifications did not present due process concerns and were admissible into evidence at trial, we give deference to the trial court's finding that both identifications were credible and cannot say that no rational trier of fact could find them credible.

Additionally, Sample asserts that the existence of other contributors for the DNA found on the gun and the possibility of secondary transfer are consistent with Sample's theory of innocence. At trial, the factfinder "determines which reasonable inferences should be drawn from the evidence, and whether to reject as unreasonable the hypotheses of innocence advanced by a defendant." *Commonwealth v. Moseley*, 293 Va. 455, 464 (2017). However, the question is

14

not whether there is some evidence to support the accused's hypotheses of innocence, but rather "whether a reasonable [factfinder], upon consideration of all the evidence, could have rejected [the accused's] theories." *Commonwealth v. Hudson*, 265 Va. 505, 513 (2003). While the Commonwealth must prove that the accused committed the crime beyond a reasonable doubt, it has to do so by excluding every reasonable hypothesis of innocence flowing "'from the evidence itself, and not from the imagination of defendant's counsel.'" *Tyler v. Commonwealth*, 254 Va. 162, 166 (1997) (quoting *Turner v. Commonwealth*, 218 Va. 141, 148 (1977)).

Here, the trial court considered and rejected the DNA secondary transfer theory because Sample did not present any evidence that would support it. Indeed, the record is devoid of any evidence that would explain how Sample's DNA could be found on the BB gun through means other than Sample himself. In contrast, the trial court heard the testimony of two forensic scientists asserting that Sample could not be eliminated as a contributor to the DNA mixture profile found in three places: on the receiver, trigger, and grip area of the BB gun. The trial court found this expert testimony credible. In addition to the DNA evidence and the eye-witness identifications, Sample lived in the path of the assailant's flight. Therefore, viewing the totality of this evidence in the light most favorable to the Commonwealth, we cannot say that no rational trier of fact could have found Sample guilty beyond a reasonable doubt. We find the evidence was sufficient to sustain Sample's conviction.

CONCLUSION

Because the trial court did not err by denying Sample's motion to suppress Angiulli's identification of Sample arising from a single photo showup or in denying his motion to strike the evidence for a lack of evidentiary sufficiency, we affirm Sample's conviction for attempted robbery.

15

*Affirmed.*